UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEIPING LIU, | |
| Plaintiff, | **Complaint** |
| – against – | Civil Action No. 6:16-CV-1080 (GLS/TWD) |
| THE INDIUM CORPORATION OF AMERICA, NING-CHENG LEE, DAWN ROLLER, AND GREG EVANS, | |
| Defendants. | |

Plaintiff, Weiping Liu, by his attorneys, Cooper Erving & Savage LLP, for his complaint herein, alleges as follows:

## INTRODUCTION AND JURISDICTIONAL STATEMENT

1.      This is a civil rights action for damages brought pursuant to 42 U.S.C. § 1981 based on race discrimination (Chinese/Asian) and retaliation, an action alleging breach of contract in violation of New York common law, an action alleging unlawful retaliation in employment in violation of New York common law, an action alleging defamation in violation of New York common law, and an action alleging violation of New York Civil Rights Law § 51.

2.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction), and the doctrine of pendent jurisdiction.

3.      Venue is properly laid in the Northern District of New York, under the provisions of 28 U.S.C. § 1391, in that all, or a substantial part, of the events or omissions giving rise to the claims alleged herein occurred within the Northern District of New York and defendant resides, or is located, in this District.

4.      Plaintiff demands a jury trial of this action.

## PARTIES

5.    Plaintiff Weiping Liu was employed by defendant Indium Corporation as a research scientist. He has a Ph.D. in Materials Science and Engineering from the Harbin Institute of Technology in China. He was a post-doctoral fellow in Mechanical Engineering at the Technical University of Berlin, Germany. Until 2005, Dr. Liu worked in academia.

6.    In 2005, Dr. Liu accepted a position as a Research Metallurgist at Indium Corporation in Clinton, New York, where he was employed until the termination of his employment on May 9, 2016.

7.    Dr. Liu is a person of Chinese/Asian race.

8.    Dr. Liu resides in the County of Oneida, State of New York.

9.    Defendant Indium Corporation is a corporation organized and existing by virtue of the laws of the State of New York.

10.    Indium Corporation describes itself as "a materials supplier to the global electronics, semiconductor, thin film, thermal management, and solar markets. Its products include solders, and fluxes; brazes; thermal interface materials; sputtering targets; indium, gallium, germanium, and tin metals and inorganic compounds; and NanoFoil®." Its products are used in the industries referred to herein.

11.    Defendant Ning-Cheng Lee (NCL) is the Vice-President of Technology of Indium Corporation.

12.    Defendant Dawn Roller (DR) is the Director of Human Resources of Indium Corporation.

13.    Defendant Greg Evans (GE) is the President of Indium Corporation.

## FACTUAL ALLEGATIONS

14.     On June 13, 2008, plaintiff advised NCL that he was resigning to join another company. However, NCL wanted to retain Dr. Liu and implored him to stay with Indium Corporation. He said "Weiping, I like you very much, and I need you to help me on the alloys." Indium offered to match the salary of his new job offer and made several additional promises to plaintiff: (1) he would have the title of Senior Research Metallurgist (matching the senior title of his new job offer), (2) he would not be terminated from employment "as long as you work hard," and (3) his office and lab conditions would be improved, including obtaining certain testing equipment and technicians to work with him. Plaintiff accepted the offer.  Plainitff and his wife later talked with NCL and his wife in a telephone call because they were leery of staying at Indium.  NCL repeated "you do not need to worry and there should be no termination or lay-off for you as long as you will work hard on your projects."  NCL's wife even said, with NCL's approval, "as long as Lee Ning-Cheng is with Indium, Liu Weiping's job in Indium is secure."  After both NCL and his wife confirmed these promises, plaintiff decided to stay with Indium.

15.     Plaintiff always worked very hard in his job, working overtime almost everyday on various projects and assignments and also working on many weekends because research and keeping up with the literature in the field takes an enormous amount of time.  He stayed in the office at Indium until late at night (e.g. 10 or 11 pm) to complete work and meet the deadlines, which is documented.

16.     Aside from increasing plaintiff's salary, NCL did not honor his promises, despite repeating them as late as April, 2015.  Nevertheless, he terminated plaintiff's employment on May 9, 2016.

17.    Plaintiff's employment was terminated because he protested mistreatment of Chinese-Americans and violations of the company's ethics and personal conduct policies, such as, for example, objecting to the marketing of a product based on false representations as to the quality of that product, objecting to the use of his name as the prime author of scientific papers that he did not author and that contained scientific conclusions he did not agree with, and objecting to a false patent application.

18.    Dr. Liu's scientific objections focused primarily on the company's marketing of the new SACm0510 based alloys, which were being misrepresented as superior to the SAC0510 based alloys. In his research for the company, Dr. Liu found that SACm alloys did in fact have improved performance in drop/shock tests for solder spheres products, but this result was unfortunately obtained through addition of material that had a side effect of increasing voiding in the solder joints, thereby decreasing reliability.  Furthermore, the SACm0510 did not produce improved drop/shock performance in solder paste products.  NCL never permitted Dr. Liu to report unfavorable aspects of the SACm alloys because that would hurt acceptance of the new product in the market.

19.    Solder alloy products of this nature are widely used in electronics assembly applications for critical industries such as automotive, telecommunications, and aircraft/aerospace.  The reliability of solder joints is critical in avoiding potential life-threatening accidents.

20.    For example, in November, 2014, plaintiff refused to sign an inventor's declaration in the SACm alloy patent application, which included a number of false statements and phony claims from Indium Corporation's SACm0510 solder paste products promotion material.  Rather than delete or correct the inaccuracies, NCL signed the document claiming he is a metallurgist when in fact he is a chemist and submitted it to the United States Patent and Trademark Office

4

(USPTO) in violation of the statutory admonition that willful false statements are subject to criminal prosecution.

21.     In April, 2015, another provisional patent application was submitted to the USPTO in violation of the statutory admonition that willful false statements are subject to criminal prosecution.   NCL took credit for a Japanese competitor's alloy composition.   Working in conjunction with Indium's patent attorney, plaintiff caused an amended patent application to be filed that deleted the reference to the competitor's alloy.

22.     During the period 2008 through 2014, there were several instances in which NCL listed plaintiff as the author of papers which he did not author and in fact disagreed with the scientific conclusions expressed therein.  Plaintiff objected.

23.     This culminated in a serious disagreement between plaintiff and NCL over a paper which NCL wrote that was published at the SMTA (Surface Mount Technology Association) International conference in late September, 2015, entitled "Novel Lead-Free Solder Alloys Development for Automotive Applications."  Plaintiff had designed five (5) novel Pb-free solder alloys for investigation and testing in comparison to a standard high-Pb solder and an alloy from a Japanese company as the controls.  The Japanese competitor's alloy is the same one that had to be withdrawn from the patent application but NCL nonetheless included it as one of Indium's alloys in the 2015 SMTA paper in which NCL named plaintiff as the first author. On July 29, 2015, plaintiff reviewed the manuscript and e-mailed NCL stating, among other comments, that "since you wrote the paper and you are the real author, I'd appreciate it if you could put your name as the first author of the paper (as I requested previously for our other previous publications)." As in the past, NCL simply disregarded plaintiff's request.  In addition, this paper contained a comprehensive experiment report but without any accompanying insightful analyses

of test results and discussions. Plaintiff was ashamed that his name was being falsely used as the lead author of an inadequate paper which included false statements (though he did not object to his name being included as among those who submitted experimental data included in the publication because that was in fact true and because he did not wish to be perceived as totally uncooperative as an employee).

24.    Because plaintiff protested product fraud and falsification of a patent application, and was unwilling to act as lead author in these papers, NCL retaliated against him and damaged his career.

25.    Furthermore, as a result of having authorship of scientific papers falsely attributed to him, defendants held him up to ridicule in the relevant scientific community. For example, at a professional society's conference in February, 2016, and a research consortium meeting in March, 2016, other scientists called him a "liar," because the conclusions in these papers were not justified, or accused him of not being a qualified metallurgist.

26.    The events of 2015-2016 were the culmination of a long series of discriminatory and retaliatory acts which resulted in the termination of plaintiff's employment.

27.    In 2012, plaintiff was invited to join the American Welding Society's brazing and soldering committee. But NCL refused to allow it because plaintiff would not yield to NCL's demands concerning SACm0510.

28.    When plaintiff produced his own significant works, Indium did not issue any internal announcement or press release. For example,

      a.  In November 2013, plaintiff's paper "A Composite Solder Alloy Preform for High-Temperature Lead-Free Soldering Applications" (published in the Welding Journal) was awarded the Robert Peaslee Brazing Award by the American

Welding Society. Plaintiff went to the AWS conference to receive the award and made a presentation at the conference.

b. In December 2015, plaintiff attended the 2015 EPTC international conference and presented his paper "Effects of Solder Alloy Compositions on Microstructure and Reliability of Die-Attach Solder Joints for Automotive Applications."

29. In contrast, Indium issued a press release for each presentation by white engineers, even for a local chapter meeting in which other engineers at Indium participated which was not at the same level of significance as the two presentations referred to above.

30. In the "Biography" section of select staff on the company's website (www.indium.com/biographies), the company put no title of Ph.D. or Dr. in front or behind of plaintiff's name, while in contrast, it put the title of Ph.D. or Dr. or even MSc in front or behind of the name of other white staff who have these degrees.

31. There is Company-wide discrimination against R&D Chinese/Asian scientists (all R&D scientists are of Chinese/Asian origin except one Caucasian) using the fact that NCL is a Taiwanese-American. For example, among others things:

a. There have been no promotions or manager positions for Chinese/Asian scientists in the US headquarters, nor has there been even any supervisor training opportunity for any Chinese/Asian in R&D, in contrast to many such opportunities in other departments for whites. All the R&D staff (about 40) report to one single person NCL (the VP of Technology), without any intermediate-level manager in between, while in other departments there is a hierarchy of positions, such as VP/director, manager, and supervisor. In spite of plaintiff's prior leadership experience of many years in materials joining research, plaintiff was

not considered for promotion, and Indium did not honor NCL's promise to give plaintiff the senior scientist title. In 2008, the company had a supervisor training program. NCL e-mailed three scientists in R&D to attend, but ultimately this training opportunity was not provided to Chinese/Asian scientists.

b.  In the professional societies and professional conferences which were company-related, the company only recommended non-Chinese/Asians to hold positions such as committee membership, magazine editors, conference session chairs, while no Chinese/Asians from R&D had any chance to do this despite the fact that by far the largest number of Ph.D. scientists in the company were in R&D and had greater qualifications for these positions. Indium not only did not recommend plaintiff for these kinds of opportunities, but they also denied his participation in these positions when he was invited by outside professionals.

c.  Indium has a corporate "Silver Quill Award" program that "encourages individuals to author world-class technical reports, presentations, articles, and books." It honors the most effective works based on their relevance to, and impact on, the industry. However, R&D is not included in this corporate program. The company and NCL do not encourage R&D scientists to write papers and make presentations except for NCL himself.

32.    In December, 2013, plaintiff complained about an incident in which a colleague in the R&D department (Hong-wen Zhang – HWZ) sabotaged his research tests and harassed him. NCL encouraged this behavior because of plaintiff's unwillingness to uncritically accept the SACm0510 product.  DR and GE discriminated against him by not investigating his complaints,

and those of other Asian-Americans, in contrast to the way they handled complaints from other R&D white (non-Asian) Americans.

33.     At a meeting on December 5, 2013 with DR and another woman, plaintiff was very emotional and wept when describing the suffering he had endured as a result of HWZ's years of harassment which were encouraged and approved by NCL. Dr. Liu told them that he had endured the harassment for so many years because NCL instructed him not to make complaints to the company except to him. Plaintiff used the Indium employee handbook and showed DR that HWZ (1) violated R&D equipment procedures, (2) sabotaged his work, (3) used foul language in the office area, and (4) lied in front of her (the Human Resources director) and coworkers. Plaintiff protested that the company did not take his complaint seriously, compared to how a Caucasian female's complaint was handled. She said that if plaintiff did not stop, plaintiff would be fired. Plaintiff's complaint was not investigated.

34.     In handling a complaint made by a Caucasian female technician (EP) in October 2012 concerning harassment by a Chinese-American R&D chemist, DR, NCL, and GE took a very different attitude, although the harassment was only a casual inappropriate remark (less serious than plaintiff's complaints ). DR made a complete investigation into the incident, interviewing all witnesses. DR and NCL (with the approval of GE) suspended the Chinese-American chemist three (3) days without pay.

35.     Similarly, another R&D Caucasian female technician (JK) complained to DR about an Asian-American R&D chemist calling her "sweetie" on one occasion. DR took this small complaint more seriously than plaintiff's complaints, and asked the Asian-American R&D chemist to make an apology to the technician. The Asian chemist had to apologize and buy donuts for her.

9

36.    In a January 2, 2014 meeting with NCL, plaintiff protested both NCL's and DR's discriminatory handling of his complaint. He said he would raise the issue with GE. Then NCL said: "Weiping, you are a grown-up and you need to consider your future."

37.    At a January 6, 2014, afternoon meeting in her office, plaintiff further showed DR his e-mail records of HWZ's previous harassment one by one. In spite of NCL's repeated threat to fire plaintiff if he insisted on making this complaint, plaintiff firmly requested DR to conduct a complete investigation, including interviewing witnesses. She said she would plan to have all the witnesses provide written statements but never did so.

38.    At a January 24, 2014 meeting, DR and GE disregarded the facts concerning HWZ's wrongdoing and failed to take any action against HWZ, nor did they even ask him to apologize, unlike the actions they took with respect to the minor incidents involving white employees mentioned above.  As a result, plaintiff continued to endure emotionally draining harassment at the hands of HWZ and NCL. During the meeting, GE used intimidating and abusive gestures to stop plaintiff's complaint of mistreatments, even though plaintiff documented the same by citing to particular emails.  Evans declined plaintiff's several requests to have a meeting with him without NCL's presence.

39.    At this meeting, plaintiff complained about repeated discriminatory and abusive treatment of him by white managers (JS and AM) of other departments.  This matter had been discussed in 2009 with NCL, who told plaintiff not to raise it with GE.  He said that plaintiff would not get the desired result from seeing GE because JS, AM, and GE, all white, socialized together at weekend parties, so GE would trust them more than Dr. Liu.  A former Chinese chemist (WSY) complained to GE and received even worse results.  When the issue came up in

2014, GE said "you see, Dr. Lee predicted the result even in 2009." His words showed he had no intention of investigating plaintiff's claims. GE repeatedly said "perception is reality."

40.    In early 2016, plaintiff was advised that his cubicle would be switched with another R&D metallurgist JGL. This would bring plaintiff into close contact with HWZ whose actions had been detrimental to plaintiff's work. On February 3, 2016, plaintiff objected to NCL concerning the switch. NCL adamantly refused to consider plaintiff's request not to switch. He claimed the switch was mandated by GE. DS (NCL's secretary) implied that plaintiff would be fired if he persisted. In the course of this conversation, plaintiff told NCL that the company only treated Chinese/Asians in this dictatorial manner.

41.    Plaintiff brought his complaint up the chain of command. On February 5, 2016, he met with DR and DS concerning NCL's order that he switch cubicles. He explained the reasons that he could not sit immediately adjacent to HWZ, who had sabotaged his work and harassed him in prior years. Plaintiff became very emotional and was trying hard to control his tears when he recounted the circumstances of his relationship with HWZ and NCL. He advised DR and DS that the switch would injure him psychologically and hence would adversely affect his daily work and productivity. He accused NCL of retaliating against him for his unwillingness to give in to NCL's unethical scientific demands. He objected that the discrimination and retaliation was illegal and that the company was not following its own EEO policy and the policies in the employee handbook. DR and GE again refused to take his complaint seriously in comparison to the relatively insubstantial complaints whites had made against Chinese/Asian scientists. GE declined plaintiff's requests to meet with him without NCL present so that they could further discuss the retaliation and discrimination and DR's unwillingness to process his complaints.

42.     On March 24, 2016, in a further effort to draw attention to his mistreatment, plaintiff raised a further issue with DR.  He advised her that he had been informed by his Indium colleagues in China that HWZ was using one of his experimental alloys and presenting it as his own.  While scientists must work collaboratively for the benefit of Indium, the origin of work should not be misrepresented.

43.     On April 11, 2016, plaintiff inquired as to whether DR was looking into the matter.  DR did not deny that HWZ was using the alloy but replied that the misuse of his work was not illegal.  Plaintiff's complaint, however, was based on a violation of company ethics, not a violation of law.

44.     Plaintiff suffered similar treatment at the hands of Ross Berntson (RB) (Executive Vice President of Marketing & Sales).  RB made racist remarks to plaintiff, stating with scorn that "you Chinese do not buy gifts for people, even your wives, and do not take vacations and spend money on vacations."  When RB mocked his Chinese accent, plaintiff replied: "Hey Ross, please give me a little bit respect. OK?" He then said "Oh, I am sorry."  But, after that, RB refused to include him in meetings related to scientific projects on which plaintiff was chief investigator and ignored his opinions of science in alloys development projects, including the inferiority of certain solders which RB knew were inferior. He rejected science in favor of marketing. One of his staff (SP, director of sales) called plaintiff "trouble" repeatedly at an Indium social gathering. Other Indium staff followed suit by calling him "trouble" or "trouble maker" on various occasions after his December 2013 complaint to Human Resources.

45.     RB also similarly discriminated against other R&D Chinese scientists in disregarding their opinions, excluding them from meetings, and treating them as second class citizens.

46.     Using one Asian to the detriment of a large number of Asians but not engaging in the same practice with whites shows that Asians are in a second class status and is discriminatory.

47.     R&D scientists are prevented from having direct contact with customers. The company's press releases and advertisements of new products contain false claims and misinformation because R&D scientists are not consulted.  Patent applications and research papers have been falsified.

48.     R&D scientists' merits and contributions are belittled in the company while marketing/sales/tech support team's contributions are exaggerated.  The company did not respect the R&D team and science because most of the R&D scientists are of Chinese/Asian race, while the former staff members are white.

49.     NCL required Chinese/Asian scientists to write research papers after-hours and on weekends, while there was no such requirement for white engineers in other departments of the company.

50.     The company created a hostile work environment in R&D. Among other things, the rules in R&D included: (1) NCL should be copied on all e-mails from R&D staff; (2) without NCL's approval, any test data could not be shared with any person outside R&D; (3) each R&D person had to email NCL a weekly report and a diligence ranking of other R&D colleagues (from working hardest to least hard using the number sequence) based on the person's daily observations (the diligence ranking requirement stopped in 2010). Furthermore, NCL did not allow his staff to make complaints to company management or Human Resources.  He encouraged his staff to fight against each other, and in this way he could maintain his dictatorship and assist in keeping Chinese/Asian scientists in a subservient position in the

company. Previously, a R&D technician with excellent work performance made a complaint to Human Resources and was laid off.

51.     The R&D scientists had the worst office conditions until the end of 2015 (e.g., plaintiff did not have even a cubicle until 2011), compared to engineers in other departments of the company, where the employees were white. R&D metallurgy and reliability testing equipment was lacking for plaintiff's entire employment.

52.     Several Chinese R&D scientists who developed innovative industry-leading products were also discriminated against and eventually driven to leave the company.

53.     NCL himself discriminated against Chinese/Asian scientists in R&D. He treated non-Asian Americans much nicer (no pushing, no overtime requirements) than Chinese/Asian, a fact well-known in the company. For example, NCL asked his deputy to record any lateness of R&D staff every day, and he criticized Chinese/Asian scientists if they were late in the morning, even less than one minute, despite the fact that plaintiff worked overtime every day. In contrast, NCL ignored Chinese/Asian scientists' complaints or pretended not to know the fact that the Caucasian scientist left for home early frequently.

54.     While NCL unreasonably pushed plaintiff harder and harder to work more and more overtime on his projects, he never asked the one Caucasian scientist in R&D to work overtime, and the Caucasian scientist had the longest employment in R&D in spite of having the least accomplishments.   When plaintiff protested NCL differential treatment of Chinese/Asians, he stated that plaintiff still had a job and some Chinese had been let go.

55.     For example, on January 21, 2009, the Caucasian scientist secretly tumbled a whole big bucket of dirty hazardous liquids onto the entire floor of a metal lab where plaintiff and another colleague used to work. This sabotage caused a major work disruption and took them a couple of

hours to dispose of the hazardous liquids and clean up the lab. Eventually, the Caucasian scientist admitted his wrongdoing to NCL. This sabotage was a safety issue involving hazardous materials. However, NCL did not inform plaintiff and other staff of the investigation result and did not take any disciplinary action, nor did he even ask the Caucasian scientist to apologize.

56.     Similarly, in October 2014, when plaintiff was on a company business trip, and missed his scheduled R&D once-a-week one hour commitment, because of his busy schedule, plaintiff emailed back the Caucasian technician who was in charge of the matter (and cc'ed NCL), stating that he would do extra time to compensate the following week. As promised, plaintiff completed two hours of the commitments the following week and reported orally to the technician. However, the Caucasian technician attempted to punish plaintiff by sending him a series of more than 10 emails for several weeks, which plaintiff protested in e-mails to her and NCL. Plaintiff emailed NCL and further addressed this matter in a subsequent meeting. Again, NCL just minimized or ignored plaintiff's protestations.

57.     In contrast, among other things, NCL's former secretary LD reported to NCL certain untrue things about a Chinese scientist (EH). According to him, NCL scolded and criticized the scientist without investigating the matter first, saying "I regret I did not fire you last time."

58.     The sum total of all these events was to keep the Chinese/Asian scientists in R&D in an inferior position, such that they could not even complain to management in an effort to rectify the situation,

59.     The discrimination against Chinese/Asian scientists in R & D was severe and persistent enough over time to constitute a hostile work environment.   Plaintiff suffered tremendous emotional distress due to the hostile work environment.

60.     On March 15, 2016, at NCL's request, plaintiff emailed NCL a Powerpoint file to show plaintiff's alloys development roadmap. The Powerpoint expressed again that plaintiff would use the SAC0510 based alloys, instead of the SACm0510 based alloys for future low-Ag Pb-free solder paste products.

61.     On March 29, 2016, NCL requested that plaintiff make the SACm0510 alloy Mn concentration proposition to the IPC solder alloys standards committee.  Plaintiff refused, responding that "...I did not work on the SACm0510 solder pastes and testing, and therefore I am not in a position to send in the proposition/comment for the SACm0510 solder paste 0.0035% Mn specification as you requested. Thank you for your understanding."

62.     On May 5, 2016, plaintiff completed another utility patent application.

63.     On May 9, 2016, plaintiff was terminated from employment.

64.     Plaintiff's protestations to management, including but not limited to his resistance to misrepresentations as to the truth of the SACm0510 solder paste, which resulted in plaintiff being labelled as a "trouble-maker," as well as the hostile work environment he was forced to endure because of his Chinese/Asian race, caused the termination of his employment.

## COUNT I: CONTRACT FOR DEFINITE DURATION

65.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

66.     Plaintiff's direct supervisor, who had actual and/or apparent authority to speak for Indium Corporation, promised him that "there should be no termination or lay-off for you as long as you will work hard on your projects" and "as long as Lee Ning-Cheng is with Indium, Liu Weiping's job in Indium is secure."

67.   Plaintiff worked hard on his projects, including working extensive hours of overtime and on weekends.  He was one of the hardest working employees in the company by any objective measure.  Furthermore, no question was raised as to the quality of his scientific work.

68.   Defendant Indium Corporation breached its contract with plaintiff by terminating his employment. *Rooney v. Tyson*, 91 N.Y.2d 685 (1998).

69.   Plaintiff is entitled to damages against Indium Corporation, including back pay, front pay, lost pension benefits, lost health insurance, lost fringe benefits, lost bonus compensation, emotional harm, compensatory, and other damages.

## COUNT II: 42 USC § 1981

70.   Repeats and realleges each of the foregoing allegations as if fully set forth herein.

71.   Plaintiff was employed by defendant Indium Corporation under a contract of definite duration as alleged in Count I.

72.   Any contract of employment, even an "at will" employment contract, is a contract as that term is used in 42 U.S.C. § 1981.

73.   Under 42 U.S.C. § 1981, plaintiff was entitled to enjoy all the benefits, privileges, terms, and conditions of that contractual relationship the same as white citizens.

74.   Defendants intentionally discriminated on the basis of race in the performance, modification, and termination of contracts in violation of 42 U.S.C. § 1981.

75.   All defendants personally participated in discriminating against plaintiff on the basis of his race.

76.   The discrimination against plaintiff was a substantial factor in the termination of his employment.

77.     Plaintiff is entitled to damages from defendants, jointly and severally, including back pay, front pay, lost pension benefits, lost health insurance, lost fringe benefits, lost bonus compensation, emotional harm, compensatory, and other damages.

78.     Plaintiff is entitled to reimbursement from defendants, jointly and severally, for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

79.     Defendants' actions against plaintiff were undertaken with reckless disregard of plaintiff's civil rights and/or with malice towards plaintiff.

80.     Due to the wanton, reckless, malicious, and/or intentional nature of defendants' actions, plaintiff is entitled to punitive damages against defendants, jointly and severally.

## COUNT III: RETALIATION UNDER 42 USC § 1981

81.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

82.     Plaintiff raised the issue of race discrimination during the course of his complaints to defendants.  He further requested that they investigate his claims but they failed to do so.

83.     Plaintiff's complaint of discrimination was a proximate cause of the termination of his employment in part because his complaints were followed closely in time by the termination of his employment.

84.     But for his complaints, plaintiff would not have been terminated.

85.     Plaintiff was explicitly terminated from employment not for any legitimate reason related to his scientific performance but because he was a "troublemaker."  Any legitimate business reason proffered for the termination of his employment was pretextual and contrived to justify the termination of his employment.

86.     Plaintiff was retaliated against because he raised the issue of race discrimination in violation

of 42 U.S.C. § 1981.

87.     All defendants personally participated in retaliating against plaintiff.

88.     As a result of such retaliation, plaintiff is entitled to damages as aforesaid against defendants, jointly and severally.

## COUNT IV:  RETALIATION NEW YORK COMMON LAW

89.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

90.     Defendant Indium Corporation had a written policy in its employee handbook that employees who report violations of its personal conduct and ethics policies will not be retaliated against.

91.     For example, the employee handbook states in no uncertain terms that "An employee who brings any work-related questions, concerns, or complaints to management's attention will not be subject to any retaliation or any adverse employment action that could affect the employee's job security or potential advancement."

92.     Plaintiff relied on that policy in reporting to defendants that NCL had not honestly presented scientific data in articles that he published and in patent applications, in protesting that another employee HWZ, with the concurrence of NCL, was sabotaging his work and engaging in unethical conduct.  The company handbook specifically protected plaintiff against sabotage of his work.

93.     As a result of his reports concerning these violations of company policy, defendant Indium Corporation, acting through its agents NCL, DR, and GE, retaliated against plaintiff by terminating his employment in violation of Indium Corporation policy.

94.     Plaintiff's complaints were a proximate cause of the termination of his employment.

95.    Defendant Indium Corporation had no policy in its employee handbook which clearly indicated to plaintiff that he should not rely on these promises of non-retaliation.

96.    Such retaliation is unlawful. *E.g., Brady v. Calyon Securities (USA)*, 406 F. Supp. 2d 307 (S.D.N.Y. 2005): *Criado v. ITT Corp.*, 1993 U.S. Dist. LEXIS 11359 (S.D.N.Y. 1993).

97.    As a result of the wrongful conduct of defendant Indium Corporation, plaintiff was damaged and is entitled to relief as aforesaid (except that attorneys' fees are not recoverable at common law).

98.    Plaintiff is entitled to damages from defendant Indium Corporation, including back pay, front pay, lost pension benefits, lost health insurance, lost fringe benefits, lost bonus compensation, emotional harm, compensatory, and other damages.

## COUNT V: DEFAMATION

99.    Repeats and realleges each of the foregoing allegations as if fully set forth herein.

100.   Defendant NCL and Indium Corporation falsely attributed to plaintiff authorship of an article that he did not author which contained false statements.

101.   The article falsely referenced alloy #6 in Table 1 as if it were a product of Indium Corporation whereas it was a product produced by a Japanese competitor.

102.   That article was published at a September 27, 2015 – October 1, 2015 SMTA convention held in Rosemont, IL of scientists and engineers in plaintiff's field.

103.   As a result of such false publication, plaintiff was ridiculed, disgraced, and discredited in his business, trade or profession.

104.   Such false publication was defamatory *per se*.

105.    As a result of such defamation, plaintiff is entitled to damages in an amount to be determined by a jury, including punitive damages, against defendants NCL and Indium Corporation, jointly and severally.

## COUNT VI: NEW YORK STATE CIVIL RIGHTS LAW § 51

106.    Plaintiff repeats and realleges each of the allegations in each of the foregoing paragraphs of the complaint.

107.    Section 51 of the New York State Civil Rights Law provides: "Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained . . . may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages."   Section 50 punishes "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person . . ."

108.    Defendants Indium Corporation and NCL knowingly published articles which purported to name plaintiff as primary author over his objection.

109.    The articles contained scientific conclusions which plaintiff objected to and which were false.

110.    The articles were published for trade purposes, that is to promote the products and business of Indium Corporation.

111.    Plaintiff is entitled to damages in an amount to be determined by a jury, including punitive damages, against defendants NCL and Indium Corporation, jointly and severally.

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in favor of plaintiff Weiping Liu as follows:

A.      On Counts I and IV against defendant Indium Corporation, for damages, including back pay, front pay, lost pension benefits, lost health insurance, lost fringe benefits, lost bonus compensation, emotional harm, compensatory, and other damages.

B.      On Counts II and III, against all defendants, acting in concert, for damages, including back pay, front pay, lost pension benefits, lost health insurance, lost fringe benefits, lost bonus compensation, emotional harm, compensatory, and other damages.

C.      On Counts V and VI against defendants NCL and Indium Corporation, jointly and severally, for damages to be determined by a jury.

D.      On Counts II and III, against all defendants, jointly and severally, for the expert witness fees and reasonable attorneys' fees incurred in the prosecution of this action.

E.      On Counts II and III, against all defendants, jointly and severally, for punitive damages.

F.      On Counts V and VI, against defendants Indium Corporation and NCL, for punitive damages.

G.      On Counts I through VI, against all defendants, jointly and severally, for the costs and disbursements incurred in the prosecution of this action.

H.      For such other and further relief as this Court may deem just and proper.

DATED:      Albany, New York
            September 2, 2016

                        COOPER ERVING & SAVAGE LLP
                        Attorneys for Plaintiff
                        39 North Pearl Street
                        Albany, New York 12207
                        (518) 449-3900


                        By:     s:/ Phillip G. Steck

Phillip G. Steck
Bar Roll #102664