**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────────────

WEIPING LIU,

                                    Plaintiff,                    6:16-cv-01080 (BKS/TWD)

v.

THE INDIUM CORPORATION OF AMERICA; NING-
CHENG LEE; DAWN ROLLER; and GREG EVANS,

                                    Defendants.

───────────────────────────────────────

**Appearances:**

*For Plaintiff:*
Phillip G. Steck
Cooper Erving & Savage LLP
49 North Pearl Street, 4th Floor
Albany, NY 12207

*For Defendants:*
Kevin G. Martin
Martin & Rayhill, PC
421 Broad Street
Utica, NY 13501

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff Weiping Liu brings this action against his former employer, the Indium

Corporation of America ("Indium"); his former supervisor, Ning-Cheng Lee, Vice-President of

Technology; Dawn Roller, Director of Human Resources; and Greg Evans, President and Chief

Operating Officer. (Dkt. No. 32). Plaintiff, who is Chinese American, alleges that Defendants

discriminated against him and terminated his employment on the basis of race. (*Id.*). He brings

claims for: (i) discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); (ii) retaliation under § 1981 and Title VII; (iii) breach of contract; (iv) retaliation in violation of New York common law; (v) defamation; (vi) violation of New York Civil Rights Law § 51; and (vii) intentional infliction of emotional distress. (*Id.* at 17–25). Plaintiff seeks compensatory and punitive damages. (*Id.* at 25–26). Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 84). The Court heard oral argument on the motion on August 14, 2019.  For the reasons set forth below, the motion is denied as to Plaintiff's § 1981 and Title VII retaliation claims (Third and Eighth Causes of Action) but is otherwise granted.

## II.    FACTS[1]

In 2005, Defendant Lee hired Plaintiff as a research metallurgist—a materials scientist—in Indium's Research and Development department ("R&D") in Utica, New York.[2] (Dkt. No. 86-1, ¶¶ 3, 5, 12; Dkt. No. 85, ¶ 1; Dkt. No. 86-2, ¶ 1). Plaintiff worked as a scientist in R&D until May 9, 2016, when Lee terminated his employment. (Dkt. No. 86-1, ¶ 92). Viewed broadly, the facts in this case fall into two categories. The first is Lee's treatment and handling of scientists in R&D in contrast to employees in Indium's other departments, which have "virtually no Asian employees." (*Id.* ¶ 17). The second is the chronology of Plaintiff's employment and termination. Both, Plaintiff contends, show Defendants' discrimination against Asians.

### A.    Indium

Indium "develops and manufactures materials used primarily in the electronics assembly industry" and is "a materials supplier to the global electronics, semiconductor, thin film, thermal

---

[1] The facts have been drawn from Defendants' statement of material facts, (Dkt. No. 85), Plaintiff's response, (Dkt. No. 86-2), Plaintiff's affidavit in opposition to Defendants' motion for summary judgment (Dkt. No. 86-1), and the attached exhibits and affidavits to these documents. The facts are taken in the light most favorable to Plaintiff.

[2] The parties also referred to the Utica location as Clinton, New York. (Dkt. No. 86-1, at 353–54). The Court utilizes Utica for convenience.

management, and solar markets." (*Id.* ¶ 6). Indium makes "materials for joining and bonding applications." (Dkt. No. 86-1, at 451). Indium's "[p]roducts" are "[p]rimarily solders and ancillary materials related to soldering" and are used in "[t]he assembly of circuit boards or semi-conductors" and a variety of other applications.[3] (*Id.* at 451–52).

In addition to the office in Utica, Indium has offices and manufacturing facilities in Chicago, China, Singapore, and South Korea, (*Id.* at 61, 413), and comprises 10 departments, including R&D, (*Id.* at 409–10). Regarding the number of Asian employees in each department, Defendant Roller testified that there are approximately: 20 employees in information technology, of which "three or four" are Asian; 350 employees in the operations production department, "some" of which are Asian; 15 employees in manufacturing engineering, of which Roller "believe[d] one to two" were Asian, but she was "not positive"; and 30 employees in maintenance, 10 employees in finance, 7 employees in human resources, 12 employees in quality, and 6 employees in supply chain, none of which were Asian. (*Id.* at 414–16).[4]

In contrast, R&D is, according to Plaintiff, a "stable of Asian scientists," which Lee maintained "for the purpose of maximizing his power." (Dkt. No. 86-1, ¶ 32). During the relevant time period, Indium had approximately 48 R&D employees (36 research scientists and 12 technicians) in offices in Utica, Chicago, and China, all of which Defendant Lee supervised. (*Id.* ¶ 15; Dkt. No. 86-1, at 61–62, 353–54).[5] Of the 12 research scientists in the Utica R&D

---

[3] Solder is defined as "a metal or metallic alloy used when melted to join metallic surfaces." *Solder*, Merriam-Webster, http://unabridged.merriam-webster.com/unabridged/solder (last visited August 14, 2019).

[4] Unless noted otherwise, the record contains no timeframe for the facts concerning the allegedly racially discriminatory environment the Asian scientists in R&D experienced. The Court recounts these facts in no particular order.

[5] The technicians in R&D "were there to assist in performing lab testing work" and were managed by Lee, who maintained the "authority to hire, fire, and make policy" with respect to them. (Dkt. No. 86-1, ¶ 36). According to Plaintiff, all of the female technicians were white. (*Id.* ¶ 70).

department where Plaintiff worked, one, Lee Kresge, was Caucasian, and 11 were "of Asian descent." (Dkt. No. 85, ¶ 15; Dkt. No. 86-1, ¶ 15). Lee testified that none of the PhDs[6] he employed—in Utica,[7] Chicago, or China—were white;[8] Kresge, the sole Caucasian research scientist, had a master's degree, not a PhD. (Dkt. No. 86-1, at 63, 493).

Plaintiff stated that Lee did not "permit [the scientists in R&D] to participate in the affairs of, and opportunities provided by, the company to the same extent as white employees." (Dkt. No. 86-1, ¶ 32). Plaintiff testified that, because "Chinese and Asians are more compliant" and yielding, it was therefore "easier for [Lee] to control" and take "advantage of [the] Chinese and Asian scientists" he hired. (Dkt. No. 86-1, at 674). Plaintiff also testified that "many [Asians] are shy to complain because of Asians' English language skills." (*Id.* at 7). Plaintiff believed that Lee "wanted . . . all the R&D, the Chinese, Asian, the people [to] follow his instructions . . . [and] to follow his order[s]," and, if R&D scientists did not "follow his instructions," Lee would "fire[] or terminate[]" them. (*Id.* at 674). The following is a description of the alleged differences between R&D and the other Indium departments.

### 1.       Working While on Unemployment

"During the post-2008 recession, Chinese scientists in R&D were forced to work 5 days for 4 days of pay plus one day of unemployment compensation." (Dkt. No. 86-1, ¶ 50). Other employees worked 4 days and received 4 days of pay plus one day of unemployment insurance compensation without being forced to work an extra day." (*Id.*; Dkt. No. 86-1, at 883–84).

---

[6] Plaintiff testified that the research scientists at Indium typically hold PhDs. (Dkt. No. 86-1, at 353–54).

[7] Roller testified that there were 24 employees in R&D in the United States, including 18 research scientists, of which 16 were Asian, one was Caucasian, and one was African. (Dkt. No. 86-1, at 417). A research scientist from Kenya was hired in 2017. (*Id.* at 355).

[8] When asked why he hired a low number of white PhDs for R&D, Lee responded that a candidate must have the appropriate education qualifications and must "pass [his] quiz." (Dkt. No. 86-1, at 64). Lee testified that his "quiz" is both oral and written; there is, however, no evidence in the record regarding the content of the "quiz." (*Id.*).

## 2. Promotion Opportunities

Roller testified that all departments, except R&D, have a supervisor or manager below the department head. (Dkt. No. 86-1, at 411). In R&D, Lee assigned a deputy "on a rotating basis" "during his travel," but this individual was "not a direct junior" to Lee. (*Id.* at 411, 456). There is no evidence that any other departments had a rotating deputy. (Dkt. No. 86-1, at 411). Because there was no intermediate position between research scientist and Lee's supervisory position, there were "[n]o opportunities for promotion . . . in R&D." (Dkt. No. 86-1, ¶ 34). At one point, Plaintiff "was scheduled for promotional/managerial training" but it "was cancelled" and "[a]ll three R&D scientists who had been scheduled were excluded from training." (*Id.*).[9] "Some [employees] transferred out of R&D to secure promotion."[10] (*Id.*).

## 3. External Awards and Committees

After winning two awards from the American Welding Society ("AWS"), Plaintiff sought permission from Lee to become a member of the AWS's brazing and soldering committee;[11] Lee refused on the ground that AWS's "activity was outside the scope of what Indium does, even though brazing and soldering are . . . among the primary specialties of the company." (Dkt. No. 86-1, ¶ 37; *see also* Dkt. No. 86-1, at 75 (Lee testifying that "this society is insignificant for our company's business")). Indium "did not publicize [Plaintiff's award], even though much lesser achievements of white personnel in other departments are consistently publicized." (Dkt. No. 86-1, ¶ 43). In addition, a white employee from Indium's marketing department with fewer

---

[9] The record does not indicate when this training was offered.

[10] According to Plaintiff, "[o]ther departments of the company permitted intermediate-level managers within their departments and allowed white employees to be trained for and be promoted into those positions." (Dkt. No. 86-1, ¶ 34).

[11] According to the Amended Complaint, Plaintiff received this invitation in 2012. (Dkt. No. 32, ¶ 29).

qualifications than Plaintiff "was allowed to become a member of the [AWS] committee." (Dkt. No. 86-1, ¶ 37; Dkt. No. 86-1, at 109–10).

According to Plaintiff, "from year to year the company received" a technology award concerning a product that came from R&D, but the award always went to white employees in other departments, even though R&D was responsible for developing the product. (Dkt. No. 86-1, at 666–67; *see also* Dkt. No. 86-1, ¶ 42).

### 4. Air Travel

Prior to 2011, "Lee did not allow R&D staff to use business class air travel (only coach class) on any overseas flight," despite Indium's travel policy, which allowed business class travel on international flights longer than 9 hours. (Dkt. No. 86-1, ¶ 50; Dkt. No. 86-1, at 925).

### 5. Silver Quill Award, Publication, and Patent Applications

Indium had a "Silver Quill Award designed to encourage publication." (Dkt. No. 86-1, ¶ 40). Lee made R&D "ineligible" for the award. (Dkt. No. 86-1, at 151).[12] Plaintiff testified that "the most important technical papers[s] come from R&D" and that it was part of his job. (*Id.* at 628). R&D employees, however, "were only allowed to write research papers after-hours and on weekends." (Dkt. No. 86-1, ¶ 40). Plaintiff "wrote 5 independent papers for publication without any participation from Lee." (*Id.* ¶ 41). R&D employees, however, "were only allowed to publish jointly with Lee." (*Id.* at ¶ 40). According to Plaintiff, "Lee often changed a few things in the article and republished it." (*Id.* ¶ 41). Lee testified that he wrote "more than 95 percent" of R&D publications and listed "the people who contribute[d] the data" as "co-authors." (Dkt. No. 86-1, at 153).

---

[12] According to Lee, the award was "designed to stimulate and encourage the staff more from the sales tech service," who are "not highly focused on the technology," "to write technical paper[s]." (Dkt. No. 86-1, at 151). During his deposition, Plaintiff dismissed the notion that the Silver Quill ward was designed to encourage the other departments that did not write papers as a basic job function. (*Id.* at 628–29).

In addition, "all patent applications from R&D had to list Lee as co-inventor, even if Lee played no actual role in the research work." (Dkt. No. 86-1, at ¶ 40). Plaintiff states that in other departments "publications and patents were not required to also include the department head as an author, and were written during work hours." (*Id.* at ¶ 40).

### 6. Email

Lee required R&D scientists to copy him on all emails and frustrated "the ability of R&D scientists to communicate effectively with other departments and customers." (Dkt. No. 86-1, 48). "No similar restrictions applied in other departments." (Dkt. No. 86-1, ¶ 48).

### 7. Prohibition Against Speaking Chinese

"Lee did not allow Chinese scientists to speak Chinese in the company" and "harshly criticized the violators and even threatened their jobs." (*Id.* ¶ 49). "There was no such rule in any other department of the company." (*Id.*). According to Plaintiff, "[w]hen a white employee in manufacturing complained about an R&D scientist distracting her by speaking Chinese on the phone, the two were separated" and the "Chinese scientist was moved to a completely different floor." (*Id.* ¶ 52). Lee testified that the manufacturing employee and the R&D scientist had a conflict concerning the scientist's food, namely the smell, and that the manufacturing employee also complained that the scientist was speaking Chinese on the phone and it was distracting. (Dkt. No. 86-1, at 252). Eventually, the R&D scientist was moved to another floor; Lee asserted that it was "not because of this conflict." (*Id.* at 253).

### B. Plaintiff's Employment

#### 1. New Job Offer

Lee hired Plaintiff as a research scientist in R&D in 2005. (Dkt. No. 86-1, ¶ 12). Plaintiff avers that, in 2008, motivated by low salary and poor working conditions, he sought work elsewhere and eventually received a job offer from another company. (*Id.* ¶¶ 18–20). When

Plaintiff told Lee of the job offer, Lee "implored" him to stay and offered to match the salary the other company was offering, give Plaintiff "the senior research scientist title," provide improved testing equipment, and assign Plaintiff additional research technicians. (*Id.* ¶ 20). Plaintiff asked Lee "for job security." (*Id.*). Lee replied that Plaintiff "would have a job at Indium as long as [he] worked hard" and "there was no misconduct." (*Id.* ¶¶ 20–21). Although Lee "refused to put that promise in writing," Lee later "repeated the promise in a phone call with [Plaintiff] and [Plaintiff's] wife." (*Id.*). "Lee also stated that as long as Lee was with Indium, [Plaintiff's] job was secure." (*Id.* ¶ 20).

### 2. Reporting Late to Work[13]

Lee required Plaintiff to "work late hours to develop product and publish" while Kresge, the sole Caucasian scientist, "went home at 5 or earlier and did not work weekends." (*Id.* ¶ 71). Kresge was often late for work but cited Plaintiff for "being late by a minute or less"—at Lee's request. (*Id.*). Lee required R&D staff to report to work at 8:00 a.m. (Dkt. No. 86-1, at 596). Although Plaintiff often worked "very hard until late at night," if he were 30 or 40 seconds late the deputy at the time would record the lateness, and report it to Lee on a weekly basis. (*Id.*). Lee would then direct his secretary to email "the people who were late" and note the number of times the employee was late that week. (*Id.*). When Plaintiff protested that Kresge was sometimes late but received no criticism, Lee "pretended not to know" and told Plaintiff that his (Plaintiff's) project was important. (Dkt. No. 86-1, at 597). Lee testified that Kresge came "in very much on time" though he left early from time to time to pick up his daughter. (*Id.* at 182). Kresge, however, testified that on at least one occasion he was late for work by more than one minute, after which his lateness was recorded. (*Id.* at 810–11).

---

[13] The record does not provide a time frame for the late arrival incidents.

### 3. Discrimination by Others

Plaintiff testified that in 2009 John Sovinsky and Andy Mackie, white managers, "treated [him] abusively" and "discriminated" against Plaintiff. (*Id.* at 638–39). Plaintiff stated that Mackie "unreasonably abusively" told him to "stop talking" and to "get out of [his] office." (*Id.* at 637). Plaintiff reported this to Lee, who responded that they were not his subordinates. (*Id.* at 639). According to Plaintiff, Lee stopped him from reporting his complaint to Evans, telling Plaintiff that because Evans, Sovinsky, and Mackie were "all white . . . and socialized together at weekend parties," Evans would trust their word over Plaintiff's, (Dkt. No. 86-1, ¶ 80), Plaintiff would "not get [his] desired result" and would "get worse results." (Dkt. No. 86-1, at 639).

Sometime prior to 2011, "Ross Bernston, then Vice-President of Sales and Marketing, and now the President of [Indium], made stereotypical comments about Chinese and mimicked [Plaintiff's] accent when [he] protested [his] exclusion from meetings on products when [Plaintiff] was the principal scientist on the project." (Dkt. No. 86-1, ¶ 45; Dkt. No. 86-1, at 665). According to Plaintiff, Bernston told Plaintiff: "You Chinese do not buy gifts for people, even your wife." (Dkt. No. 86-1, at 665).

### 4. Plaintiff's Complaints to Lee

In August 2013, at a dinner with Lee, Lee's wife, and Plaintiff's wife, (*Id.* at 598), Plaintiff told Lee that he treated Asian scientists differently than "the white Americans." (*Id.* at 606). Plaintiff avers that he "complained explicitly to Lee of the discrimination against [him]self and Ed Ho," and warned that the company could be sued. (Dkt. No. 86-1, ¶ 73). Lee acknowledged that Plaintiff talked to him "[a]t least a couple times" about his (Plaintiff's) perception that Chinese were being treated differently than non-Chinese. (Dkt. No. 86-1, at 183–84). Lee could not, however, recall when Plaintiff made these comments. (*Id.* at 184).

### 5. Conflict with Hong Wen Zhang

Although Plaintiff and Hong Wen Zhang, another research scientist, had a conflict involving a "diamond saw" at some point in time, Plaintiff provided no details about the incident. (*Id.* at 609). Plaintiff stated that Zhang also spilled chemical fluid and then blamed Plaintiff. (*Id.* at 607–08). Plaintiff testified that he wanted to report the difficulties he was having with Zhang to Evans and "the company management," but Lee "did not allow" Plaintiff to do so and told Plaintiff that he and Zhang should not speak to each other. (*Id.* at 609–11). Plaintiff stated that he and Zhang "did not talk to each other for several years." (*Id.* at 609).

In December 2013, Plaintiff had been utilizing an oven to conduct a "research test." (*Id.* at 606–07). According to Plaintiff, Zhang "sabotaged [the] research test" by shutting down the oven without telling Plaintiff, Plaintiff's technician, or any of "the people who were using the equipment." (*Id.* at 607). As a result, Plaintiff's experiment was ruined. (*Id.* at 368). Plaintiff testified that he spoke to the research scientist responsible for managing the oven and said he would not "tolerate this behavior." (*Id.* at 612). Plaintiff stated that Zhang overheard him, "jumped into the conversation," and said that Plaintiff was "stupid." (*Id.*). Plaintiff responded by asking Zhang why he "jump[ed]" into the conversation to say he (Plaintiff) was "stupid" when he (Zhang) "shut down the equipment without informing" them. (*Id.*).

On December 5, 2013, Plaintiff met with Roller to report Zhang's harassment. (Dkt. No. 86-1, ¶ 75). Plaintiff told Roller that Lee had encouraged and approved the harassment and that Lee had "instructed [him] not to make complaints to [anyone in] the company except . . . him." (*Id.*). Plaintiff informed Roller that Zhang had: (i) violated R&D equipment procedures; (ii) sabotaged Plaintiff's work; (iii) used insulting language in the office and called Plaintiff "stupid"; and (iv) lied "in front of [Roller] and coworkers." (*Id.*). Plaintiff told Roller that Indium did not "take [his] complaint seriously, compared to how the complaints of white female

10

technicians were handled." (*Id.*). Roller replied that if Plaintiff "did not stop, [he] would be fired." (*Id.*). Plaintiff stated that his "complaint was not investigated." (*Id.*).

Roller testified that Zhang admitted referring to Plaintiff as "stupid." (Dkt. No. 86-1, at 368, 382). Roller explained to Zhang that "any kind of name calling was inappropriate," but Zhang was not disciplined. (*Id.* at 389).

Lee testified that he investigated the oven incident by talking to Plaintiff and asking Zhang what happened. (*Id.* at 216). Plaintiff stated that he complained to Lee about the treatment of Chinese Americans in connection with this incident but did not provide details about what he said. (*Id.* at 606). Lee testified that he believed he and Roller "had some discussion" in 2013 about Zhang and Plaintiff. (*Id.* at 213).

On January 2, 2014, Plaintiff met with Lee to discuss the persistent "conflict" with Zhang. (Dkt. No. 86-1, ¶ 77). Plaintiff "again protested that Lee and Roller had discriminated against [him] in the handling of [his] complaints against Zhang in comparison to how the complaints of white females were handled" and stated that he "intended to raise the issue with company president Greg Evans." (*Id.*). Lee told Plaintiff that human resources could not take disciplinary action because it did not have "a clear picture" of what happened. (Dkt. No. 86-1, at 632). Plaintiff responded that human resources did not investigate or interview any witnesses, and he told Lee that he "desire[d] resolution" and "needed to see Greg Evans." (*Id.* at 632–33). Lee responded that Plaintiff was "a grownup" and told him that he "need[ed] to consider [his] future." (*Id.* at 633).

On January 6, 2014, Plaintiff met with Roller to discuss "the progress of the investigation," (*Id.* at 633–34), showed her "one-by-one e-mail records of Zhang's harassment," and requested—despite Lee's "repeated threat to fire [him] if [he] insisted on continuing with

this complaint"—that Roller "conduct a complete investigation, including interviewing witnesses," (Dkt. No. 86-1, ¶ 78). Although Roller told Plaintiff she planned "to have all the witnesses provide written statements," according to Plaintiff, she never obtained any. (*Id.*). Roller stated that Plaintiff asked her to interview witnesses to the alleged harassment and that she tried to, but "most people that [she] contacted would not give anything concrete." (Dkt. No. 86-1, at 391). According to Plaintiff, Roller told him that he could make an appointment to see Evans. (*Id.* at 634).

On January 24, 2014, the date Plaintiff was scheduled to meet with Evans, Plaintiff was surprised when he arrived for the meeting to find Roller and Lee there as well. (*Id.* at 635). They asked Plaintiff to give a brief account and to state his "request." (*Id.* at 636). Plaintiff told Evans that white managers of other departments had been "dismissive of [him] and resistant to [his] efforts to carry out the mission of R&D as assigned . . . by Lee." (Dkt. No. 86-1, ¶ 80). He also told Evans that "in 2009 John Sovinsky, Andy Mackie treated [him] abusively, [and] discriminated" against Plaintiff and that a white manager had "abusively said to [Plaintiff] stop talking, get out of my office." (Dkt. No. 86-1, at 637, 638–39). Plaintiff further informed Evans that he had "discussed this in the past with Lee, who told [him] not to raise it with Evans," and that Lee said "because they were all white . . . and socialized together at weekend parties," Evans would trust their word over Plaintiff's. (Dkt. No. 86-1, ¶ 80). Lee further warned Plaintiff that he would "not get [his] desired results" but instead would "get worse results." (Dkt. No. 86-1, at 639). According to Plaintiff, Evans responded: "hey, you see, Dr. Lee predicted this even in 2009." (*Id.*). Plaintiff stated that during the meeting, "Evans used intimidating and abusive gestures to show that [Plaintiff] should stop complaining of mistreatment" and told Plaintiff that "perception is reality" regarding whether Plaintiff's "complaints were interpreted as making

[him] difficult to work with." (Dkt. No. 86-1, ¶¶ 79–80). According to Plaintiff, "[t]hey refused to take any action with respect to Zhang" and did not "even ask [Zhang] to apologize, unlike the actions they took with respect to the minor incidents involving white employees mentioned above." (*Id.* ¶ 79).

At the conclusion of the meeting, Roller felt that they "had tried everything we could try to resolve this conflict and that we were hoping that the gentlemen could work through it or agree to work near each other with minimized contact. And that was the path that they were choosing that we were observing them choosing." (Dkt. No. 86-1, at 389). According to his testimony, Lee told Roller that, if there was another dispute between Zhang and Plaintiff, "[b]oth will be . . . disciplined." (*Id.* at 213).

### 6. Investigation of Other Complaints Against Asian Scientists

According to Plaintiff, when white technicians in R&D "complained that mildly inappropriate language was used" by two Asian R&D scientists, "investigations were immediately conducted," and one of the scientists (Ed Ho) "was suspended without even having the opportunity to defend himself," while the other scientist (Arnab Dasgupta) "was directed to apologize." (Dkt. No. 86-1, ¶ 47).

In 2012, a female technician complained about R&D scientist Ed Ho to her manager, who reported the incident to human resources. (Dkt. No. 86-1, at 850, 855–56). Roller testified that Ed Ho "made numerous remarks to [the technician] about the fact that she would have a difficult life in work and out of work because she is a redhead and not a blonde, because she is a female, because she is young and strong willed and speaks her mind." (*Id.* at 384–85). According to Roller, Ho admitted the remarks but "did not think his remarks were unkind or unprofessional or inappropriate" and "took the position that he was giving [the technician] fatherly advice." (*Id.* at 385). He was suspended for three days without pay. (*Id.* at 385, 856).

Dasgupta testified that he wrote "Hey, Sweetie" in an email to a female technician. (*Id.* at 946). Dasgupta stated that the technician "thought it was very condescending" and complained to human resources. (*Id.* at 846). Dasgupta testified that Roller emailed him about it but did not speak to him in person. (*Id.* at 947). Roller advised Dasgupta to apologize. (*Id.* 386). Dasgupta brought the technician doughnuts but did not apologize formally. (*Id.*, at 946).

### 7.     Patent Applications and Research Paper

In November 2014, Lee asked Plaintiff to "sign an inventor's declaration in the SACm alloy patent application," which Plaintiff claims "included a number of false statements and phony claims from Indium Corporation's SACm0510 solder paste products promotion material related to the alleged improved performance of SAC0510 when manganese was added." (Dkt. No. 86-1, ¶ 66; Dkt. No. 86-1, at 646–48). Plaintiff told Lee he "would not sign the declaration because it contained false representations and to do so was illegal." (Dkt. No. 86-1, ¶ 66). According to Plaintiff, "[r]ather than delete or correct the inaccuracies, Lee signed" the declaration and submitted it to the United States Patent and Trademark Office ("USPTO"). (*Id.*).

In April 2015, Indium submitted another provisional patent application. (Dkt. No. 86-1, ¶ 67). According to Plaintiff, "Lee took credit for a Japanese competitor's alloy composition which was included in the application." (*Id.*). Working with Indium's patent attorney, Plaintiff "caused an amended patent application to be filed that deleted the reference to the competitor's alloy." (*Id.*).

In July 2015, Plaintiff reviewed a manuscript for a paper entitled "Novel Lead-Free Solder Alloys Development for Automotive Applications." (*Id.* ¶ 100; Dkt. No. 86-1, at 1018). On July 29, 2015, Plaintiff stated in an email to Lee: "since you wrote the paper and you are the lead author, I'd appreciate it if you could put your name as the first author of the paper." (Dkt. No. 86-1, ¶ 100). Lee "ignore[d] his request." (Dkt. No. 86-1, at 297). Lee explained that he

believed that "the people in [his] department should all get a better visibility better publicity therefore they can have a more reputation in the industry." (*Id.*). Plaintiff "was ashamed that his name was being falsely used as the lead author" because he believed the paper was "inadequate" and "included false statements." (Dkt. No. 86-1, ¶ 100). Plaintiff asserted that the paper falsely referenced an alloy "as if it were a product of Indium Corporation whereas it was a product produced by a Japanese competitor." (*Id.* ¶ 101). The paper was published "at a September 27, 2015 – October 1, 2015 Surface Mount Technology Association conference."[14] (*Id.*). Afterward, Plaintiff reported to Lee that he had been criticized for not having "test data to support" the paper and that someone "called him a liar." (Dkt. No. 86-1, at 298).

### 8. Cubicle Switch

In early February 2016, Doreen Smith, Lee's secretary approached Plaintiff and Jeff Luo, also a research scientist, and advised them that Lee wanted them to switch cubicles. (*Id.* at 620). This switch meant that Plaintiff "would be working right next to Zhang." (Dkt. No. 86-1, ¶ 81). Plaintiff testified that Smith told him that Lee wanted Plaintiff to "have more interaction" with an employee in the manufacturing engineering department named Mark. (Dkt. No. 86-1, at 620–21). Plaintiff thought this move made no sense, however, because he already had a "very good relationship with Mark." (*Id.* at 621). Plaintiff avers that Smith "implied that [Plaintiff] would be fired if [he] persisted in resisting the cubicle switch." (Dkt. No. 86-1, ¶ 84).

On February 3, 2016, Plaintiff asked Lee to reconsider the cubicle switch. (*Id.*). Plaintiff states that Lee refused and claimed the switch "was mandated by Evans." (*Id.*). Plaintiff avers that he then told Lee that it was his belief that "the company only treated Chinese/Asians in this

---

[14] Plaintiff states that "the SMTA is self-described as an industry group of 'electronics engineering and manufacturing professionals.'" (Dkt. No. 86-1, ¶ 108).

dictatorial manner," (*Id.*; Dkt. No. 86-1, at 626–27), expressed his concern that sitting near Zhang would damage him "psychologically" because they did not get along, and asked if they could discuss the switch with Evans. (Dkt. No. 86-1, at 622–23). According to Plaintiff, Lee again stated that the change was at Evans' request, based on Evans' desire for Plaintiff to "have more interaction with Mark" from manufacturing engineering.[15] (*Id.* at 627). Lee recalled telling Plaintiff that "the whole design of the new seat for the department involving the sales, tech service, and engineering and also R&D, is trying to make them branded and remove the wall between the departments."[16] (*Id.* at 249). Plaintiff responded by asking both Lee and Roller for access to Evans to decide the issue, but his request was "disregarded." [17] (*Id.* at 625–26).

On February 5, 2016, Plaintiff met with Roller and Smith and again explained that, if he had "to sit immediately adjacent to Zhang," the resulting psychologically damage would negatively affect his daily productivity at work. (Dkt. No. 86-1, ¶ 85). Plaintiff further expressed his belief that Lee was retaliating against him, as "the real reason for the cubicle switch" was his "unwillingness to give in to Lee's unethical scientific demands." (*Id.*). According to Plaintiff, he

---

[15] Plaintiff testified that he received "[v]arious explanations for the move," including "to facilitate cooperation between R&D scientists and production department employees by seating them next to each other" and to "force" Plaintiff and Zhang to "get along." (Dkt. No. 86-1, ¶ 83). Roller testified that the reason for the switch was to allow Plaintiff "[t]o demonstrate that the department could overcome challenges, personality challenges, and get along and work efficiently as a team." (Dkt. No. 86-1, at 343). Roller stated that the request was made intentionally and with the knowledge that Plaintiff was having difficulty with the person adjacent to him. (*Id.*). According to Roller, it was her understanding that Evans supported the decision. (*Id.* at 344–45). Plaintiff claims that the "move was designed to cause [him] to 'lose face,' by punishing him for his complaints about Zhang and for refusing to accede to demands that he participate in the fraudulent marketing of SACm0510." (Dkt. No. 86-2, ¶ 27).

[16] Lee stated that, at the time, the design did not promote interaction because employees did not "have to talk to other people," and that, if a cubicle was "open to each other[,] at least you say hi in the morning." (Dkt. No. 86-1, at 250). Lee also testified that Plaintiff was "the one being complained about most by the manufacturing engineering department." (*Id.*). There is no evidence, however, that Lee shared this information with Plaintiff.

[17] "Evans declined Plaintiff's requests to meet regarding these issues." (Dkt. No. 86-1, ¶ 85). Evans testified that he refused to meet with Plaintiff because he had been "informed that the decision had been made, that [Plaintiff] was going to be terminated." (Dkt. No. 86-1, at 464). The record does not reflect when Evans learned of Lee's decision to terminate Plaintiff. (*Id.* at 446).

also warned them that "discrimination and retaliation were illegal and that the company was not following its own EEO policy and the policies in the employee handbook." (*Id.*).

Roller testified that Lee had discussed the cubicle switch with her and had told her that the recent removal of walls between R&D and manufacturing engineering created "a very good working relationship" between the two departments; based on this success, he believed that Plaintiff and Zhang should sit together. (Dkt. No. 86-1, at 397). Roller further testified that she recalled "exchanging e-mails and talking with Dr. Lee about his frustrations with [Plaintiff] not moving this issue forward and not making effort—to either neutralize or re-establish relationships with Mr. Zhang." (*Id.*). Lee also told her that "he would not tolerate such insubordination and that it was leading to other problems in the department where other people felt they did not need to follow his directive." (*Id.* at 396).

### 9. Zhang's Use of Plaintiff's Alloy Design

At a group meeting on March 4, 2016, Plaintiff and Zhang argued about Zhang's alleged use and presentation of Plaintiff's alloy as his own earlier that year.[18] (Dkt. No. 86-1, at 614–15). Plaintiff reported this issue to Smith, who responded that she would report the incident to Lee and that Roller would talk to Plaintiff. (*Id.* at 617). Plaintiff also sent an email to Lee about Zhang's use of Plaintiff's alloy design ideas. (*Id.*).

On March 24, 2016, Plaintiff advised Roller that he had learned from Indium colleagues that Zhang was using one of Plaintiff's "experimental alloys and presenting it as his own." (Dkt. No. 86-1, ¶ 87). Roller replied that she would investigate and get back to Plaintiff. (Dkt. No. 86-1, at 617).

---

[18] Plaintiff testified that this was not the first time Zhang had done this and that, in April 2015, Zhang took Plaintiff's "alloy design ideas" and "presented it as his own idea" to others. (Dkt. No. 86-1, at 614). Plaintiff "protested" about this to Lee, and Lee agreed with Plaintiff. (*Id.*).

On April 11, 2016, Plaintiff inquired "as to whether Roller was looking into the matter of Zhang's use of [his] experimental alloy." (Dkt. No. 86-1, ¶ 90). According to Plaintiff, Roller "did not do anything" but told him that she had talked to Indium's patent attorney, who said Zhang's actions were legal. (Dkt. No. 86-1, at 618). Plaintiff indicated, however, that his complaint was not that Zhang's actions were illegal but that they were unethical. (*Id.*). Roller testified that she recalled Plaintiff "being disappointed" that Zhang was not giving him credit in his presentations and that she told Plaintiff that Zhang's representations were not illegal.[19] (*Id.* at 401). Plaintiff testified that he believed Lee encouraged Zhang's behavior by not stopping him. (*Id.* at 619).

### 10. Alloy Presentation to Committee

On March 29, 2016, Lee requested that Plaintiff "make the SACm0510 alloy Mn concentration presentation to the IPC solder alloys standards committee." (Dkt. No. 86-1, ¶ 88). Plaintiff refused on the ground that he did not "work on the SACm0510 solder pastes and testing" and therefore was "not in a position to send in the proposition/comment." (*Id.*).

### 11. Termination of Employment

On May 9, 2016, Plaintiff was terminated. (Dkt. No. 86-1, ¶ 92). Plaintiff stated that, shortly after he arrived and began working, Smith asked him to go to Lee's office. (Dkt. No. 86-1, at 676). When he arrived, both Lee and Roller were there, and Lee informed him that his employment had been terminated. (*Id.*; Dkt. No. 86-1, ¶ 92). Lee testified that he told Plaintiff he had been "let go" and that it was "very simple [and] straight forward." (Dkt. No. 86-1, at 185). Plaintiff testified that there was no discussion about the reasons for his termination. (*Id.* at 677). Roller asked Plaintiff to gather his personal things. (*Id.* at 676).

---

[19] When asked during her deposition whether "one scientist representing another's work as his own would be unethical," Roller responded that such a representation "seem[ed] inappropriate" to her. (Dkt. No. 86-1, at 402).

Lee testified that, before terminating Plaintiff's employment, he went to Evans and told him that he was going to terminate Plaintiff and that the reason was the "disruptive factor."[20] (*Id.* at 262). Evans testified that Lee told him that he "was ready to terminate" Plaintiff's employment based on Plaintiff's "insubordination," which was "[r]elated to a movement of [Plaintiff] to a cubicle that was adjacent to the other people that were in the same function, same project types as he was." (*Id.* at 445). Evans stated that he was not aware that Lee was switching Plaintiff with Jeff Lou, only that "there was a refusal to move." (*Id.* at 446). Lee also discussed Plaintiff's termination with Roller, and during that conversation, Lee mentioned the cubicle switch. (*Id.* at 262-63). In his deposition, Lee testified that the reasons for Plaintiff's termination were: the "disruptive factor"; Plaintiff's difficulty in "getting along with other staff,"[21] which had "been discussed multiple times" with him, (*Id.* at 174, 264, 186); and Plaintiff's "very loud, open remark about" not wanting to switch cubicles, which he made, "in front of the whole crowd," (*Id.* at 265). Lee described the cubicle issue as the "last straw," (*Id.* at 185), but also stated that it was not "the precipitating factor" and that it was part of "a series of events about [his] difficulty [fitting] into this big team." (*Id.* at 175, 185).

### C.     Procedural History

On September 2, 2016, Plaintiff filed the present action alleging, among other things, discrimination and retaliation in violation of § 1981 and breach of contract. (Dkt. No. 1). On September 12, 2017, following his receipt of a right-to-sue letter (dated July 7, 2017) from the

---

[20] Lee, however, did not need Evans' approval to terminate Plaintiff. (Dkt. No. 86-1, at 445).

[21] Lee identified Yan Liu and Dasgupta as two individuals (in addition to Zhang) with whom Plaintiff experienced difficulty, but he did not recall having a conversation about those specific individuals with Plaintiff. (Dkt. No. 86-1, at 187–88).

U.S. Equal Employment Opportunity Commission (the "EEOC"), Plaintiff filed an Amended Complaint adding Title VII discrimination and retaliation claims. (Dkt. No. 32, ¶¶ 5–6).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. FEDERAL CLAIMS[22]

### A. Race Discrimination

Plaintiff claims that Defendants discriminated against him on the basis of his race when they terminated his employment, in violation of § 1981[23] and Title VII.[24] Under § 1981, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and

---

[22] Although Defendants seek summary judgment dismissing Plaintiff's hostile work environment claim, (Dkt. No. 84-16, at 12–15), the Amended Complaint does not assert a hostile work environment claim, (*see generally*, Dkt. No. 32), and Plaintiff acknowledges that there is no such claim in this action, (Dkt. No. 86, at 15 n.4).

[23] Defendants argue that Plaintiff's § 1981 claim fails because there is no evidence that Defendants deprived him of "a contract benefit that was given to white employees." (Dkt. No. 84-16, at 8). Plaintiff did not respond to this argument in his response papers. Defendants further assert that Plaintiff concedes that "no other employee in the history of Indium, has ever received a contract of employment." (Dkt. No. 87, at 4). Thus, because he has failed to raise an issue of material fact as to the existence of a contract, any § 1981 claim premised on a theory of contract discrimination is dismissed. To the extent Plaintiff also intends to advance a race discrimination claim under § 1981, the Court analyzes it together with his Title VII claim.

[24] Defendants argue that many of Plaintiff's allegations are outside Title VII's statute of limitations—300 days. (Dkt. No. 87, at 10 (citing 42 U.S.C. § 2000e-5(e)(1))). They argue that, since Plaintiff filed his EEOC charge on August 16, 2016, "only acts of discrimination that occurred after November 6, 2015 are actionable . . . under Title VII). (*Id.*). As discussed below, Plaintiff only challenges his termination, which occurred in May 2016 and is therefore actionable. To the extent Defendants argue the Court should disregard evidence outside the 300-day limitations period, their argument is without merit. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (stating that acts occurring outside the limitations period may be used "as background evidence in support of a timely claim").

equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It therefore "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). Title VII, in relevant part, provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Discrimination under § 1981 and Title VII are analyzed under the same *McDonnell Douglas*[25] framework. *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("The Title VII [and] § 1981 . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*.").[26]

First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must

---

[25] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[26] Individuals are not subject to liability under Title VII. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). Thus, to the extent Plaintiff brings Title VII claims against the individual defendants, those claims are dismissed.

"come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### 1.      Prima Facie Case

To establish a prima facie case of employment discrimination under § 1981 and Title VII, a plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). The fourth factor of this test may be satisfied "through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (citation omitted). Plaintiff has satisfied the first, second, and third prongs of the prima facie case because it is undisputed that: as a Chinese American and Asian, he is a member of a protected class; he was qualified to be a research scientist; and his employment was terminated. (Dkt. No. 51-32, at 7). Defendants contend, however, that Plaintiff has failed to present evidence showing that the circumstances of his termination give rise to an inference of discrimination.

An inference of discrimination can arise from circumstances such as: "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in

ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

Plaintiff does not point to any direct evidence of racial discrimination; rather, he maintains "[t]here is ample circumstantial evidence" supporting an inference of intentional discrimination by Lee, Roller, and Indium. (Dkt. No. 86, at 15). Specifically, Plaintiff argues that Defendants' racial stereotyping, disparate treatment of white and Asian employees, prohibition against speaking Chinese, and racially discriminatory remarks are sufficient to demonstrate their intent to discriminate on the basis of race.

### a.    Racial Stereotyping[27]

"[B]oth the Supreme Court and the Second Circuit have held that decisions resulting from 'stereotyped' impressions or assumptions about the characteristics or abilities of women violate Title VII." *Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d 289, 309–10 (E.D.N.Y. 2007) (citing inter alia *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708 & 708 n.13 (1978) and *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998); *see Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009) ("When employment

---

[27] The Second Circuit has defined "stereotyping" as "'the supposition that [an individual] *will* conform to a [class-based] stereotype'" and is therefore less suited to perform a certain function." Naumovski v. Norris, No. 18-1556-cv, No. 18-2663-cv, 2019 WL 37701913, at *8 n.44, 2019 U.S. App. LEXIS 23891, at *18 n.44 (2d Cir. Aug. 12, 2019) (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (emphasis in original)).

decisions are based on invidious sex stereotypes, a reasonable jury could infer the existence of discriminatory intent."). "These same principles undoubtedly apply with equal force to racial and ethnic stereotyping. *Zhao*, 472 F. Supp. 2d at 310 (citing *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58–61 (1st Cir. 1999)).

Plaintiff argues that Lee's hiring of Asian-Americans "was the foundation for his discrimination policy." (Dkt. No. 86, at 3). Plaintiff believes that he, and the Asian research scientists with whom he worked, were victims of racial stereotyping. Plaintiff testified that he believed that because "Chinese and Asians are more compliant" and yielding, it was therefore "easier for [Lee] to control" and take "advantage of [the] Chinese and Asian scientists" he hired. (Dkt. No. 86-1, at 674). Plaintiff also testified that he believed that Lee "wanted . . . all the R&D, the Chinese, Asian, the people [to] follow his instructions . . . [and] to follow his order[s]," and, if R&D scientists did not "follow his instructions," Lee would "fire[] or terminate[]" them. (Dkt. No. 86-1, at 674). Plaintiff cannot, however, rely on his own racial stereotypes to prevail. While Plaintiff testified to *his* belief that Lee hired Asians for research scientist positions because they were easy to control or take advantage of, he presented no evidence from which a fact finder could infer that Lee, or others at Indium held that belief. *Cf.*, *Zhao*, 472 F. Supp. 2d at 308 (noting that the plaintiff adduced evidence that the individual who hired her indicated to the plaintiff at the time of hiring that she "liked to employ Chinese people because they work very hard and very long hours"). Plaintiff has not identified any comment made or adopted by any Defendants that could be construed as an invidious racial stereotype.

Plaintiff points to evidence that the R&D department was structured differently, and employees were required to work harder in a less favorable environment than employees in other departments. Plaintiff introduced evidence that, unlike employees in other departments, the

predominately Asian R&D scientists had to work while on unemployment, (Dkt. No. 86-1, ¶ 50); were not eligible for promotions within the department, (Dkt. No. 86-1, ¶ 34; Dkt. No. 86-1, at 411, 456); were not allowed to join industry committees, (Dkt. No. 86-1, ¶ 37; Dkt. No. 86-1, at 109–10); did not receive publicity from Indium for their achievements, (Dkt. No. 86-1, ¶ 43), and received no internal technology awards, (Dkt. No. 86-1, ¶ 42); were not allowed to travel business class on overseas flights before 2011, (Dkt. No. 86-1, ¶ 50; Dkt. No. 86-1, at 925); were not eligible for the Silver Quill award, (Dkt. No. 86-1, at 151); were required to publish but not permitted to write during business hours and had to include the department head as an author, (Dkt. No. 86-1, ¶ 40); were required to list the department head as co-inventor on patent applications, (Dkt. No. 86-1, ¶ 40); and were required to copy the department head on all email, (Dkt. No. 86-1, ¶ 48).  But again Plaintiff failed to elicit any evidence from which a jury could infer that his working conditions were based in any way on his race or racial stereotyping.

Thus Plaintiff has failed to elicit any specific facts from which a jury could reasonably infer discrimination based on a racial stereotype.

### b.     Disparate Treatment

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotations and citation omitted). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz*, 609 F.3d at 493–94 (quoting *Graham*, 230 F.3d at 40). "In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" *Id.* at 494 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). Therefore, when

reviewing a plaintiff's termination for misconduct, the Court looks to "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards, and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40. Conclusory allegations that a plaintiff was similarly situated to her coworkers will not suffice to establish a prima facie case. *Shumway*, 118 F.3d at 65. While "[o]rdinarily the question of whether two employees are similarly situated is a question of fact for the jury," a court can determine whether a plaintiff has "adduced enough evidence to support a finding" that the plaintiff and the comparators were sufficiently similarly situated to support an inference of discrimination. *Mandell*, 316 F.3d at 379.

Here, Plaintiff advances three categories of comparators: employees in other departments; Lee Kresge, the sole Caucasian research scientist in R&D; and white technicians in R&D.

### i.      Employees in Other Departments

Even assuming the truth of Plaintiff's allegations regarding the differences between the working conditions in R&D and the other departments at Indium, Plaintiff has presented no evidence that he, as a research scientist in R&D, had a similar position to employees in the other Indium departments or that they were all subject to "the same performance evaluation and discipline standards." *Ruiz*, 609 F.3d at 493–94. Indeed, according to Plaintiff, Lee controlled all aspects of the management of the R&D department, and there is no evidence concerning the performance requirements for individuals in the other departments. Nor is there evidence of any employee outside R&D who engaged in conduct comparable to Liu. A factfinder, therefore, would have no basis on which to find that the reason for any disparity in treatment was race. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 546 (E.D.N.Y. 2014) (finding the plaintiff's allegations that he was treated less favorably than similarly situated employees outside his protected group in

connection with, among other things, overtime, use of sick and vacation leave, free health insurance, progressive discipline, daily breaks, business cards, and the use of a hand-scanner attendance system "failed to raise an inference of discrimination where the plaintiff . . . compared his treatment at [the defendant company] to that of more than 50 other individuals" but failed to show that they were "outside of his protected group" and "similarly situated to the plaintiff in all material respects").

### ii. Kresge

Plaintiff asserts that Kresge, the sole Caucasian research scientist, was often late to work but was never criticized for it, did not publish, and had direct access to Evans. Neither party disputes that Kresge is a suitable comparator: he was a research scientist in R&D and under Lee's supervision. Kresge testified that he was "comfortable enough" with Evans to walk "into his office" to talk to Evans about a problem, "which [he] ha[d] done before." (Dkt. No. 86-1, at 815). Plaintiff testified that Lee denied him access to Evans. (Dkt, No. 86-1, at 609). Even crediting these allegations as true, however, there is no evidence whatsoever that Kresge engaged in insubordination or had difficulty getting along with another employee. Accordingly, the evidence concerning Lee's allegedly preferential treatment of Kresge does not raise an inference of discrimination.

### iii. White Research Technicians

Plaintiff relies on Defendants' treatment of two white research technicians in R&D, who complained that they were sexually harassed by Asian research scientists, as evidence of disparate treatment showing discriminatory intent. Although Plaintiff, as a research scientist, had different duties than the research technicians, it is undisputed that all three were subject to Indium's harassment policy, supervised by Lee, and were therefore subject to the same performance and evaluation standards—at least in the context of complaining about harassment.

Plaintiff contends that when a white research technician complained to Roller that Ed Ho, a research scientist, had used "mildly inappropriate language" "comparing blondes and redheads," Ho was suspended without pay for three days. (Dkt. No. 86-1, ¶¶ 47, 69). Plaintiff asserts that, when a white research technician complained to human resources that Dasgupta had called her "sweetie," Roller advised Dasgupta to apologize. (Dkt. No. 86-1, at 386, 846, 947). Both research technicians, like Plaintiff, complained to Roller about harassment. In contrast, Plaintiff alleges, when he complained about Zhang's harassment, Roller threatened his employment, never conducted a meaningful investigation, and never punished Zhang; moreover, Lee directed him to sit in close proximity to his harasser and, when he refused, terminated his employment. Thus, the white technicians arguably engaged in comparable conduct but were taken seriously, and, unlike Plaintiff, were not punished for it. The Court concludes for purposes of establishing a prima facie case that Plaintiff has shown that the white research technicians "have a situation sufficiently similar to [his] to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

c. **Discriminatory Remarks**

Plaintiff contends that remarks by: (i) two white managers; (ii) Indium's now president, Ross Bernston; (iii) Evans, and (iv) Lee demonstrate racially discriminatory animus. The Second Circuit has provided the following guidance for considering whether "stray remarks" are probative of discriminatory intent:

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination . . . . The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.

*Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Further, as the Circuit has recognized,

> district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010).

### i. White Managers

According to Plaintiff, in 2009, two white managers "abusively, discriminated" against Plaintiff, and one told Plaintiff to "stop talking" and "get out of [his] office." (Dkt. No. 86-1, at 637–39). Because Plaintiff provided no specifics regarding the white managers' allegedly abusive and discriminatory language, the allegation is conclusory and fails to raise a material issue of fact about racially discriminatory intent. Moreover, while the instruction to "stop talking" and "get out" is more specific and certainly hostile, even construed in the light most favorable to Plaintiff, no reasonable factfinder could infer it was racially motivated. In addition, their alleged comments were made six years before Plaintiff's termination and there is no evidence that either manager was involved in the decision to terminate Plaintiff's employment.

### ii. Ross Bernston

Plaintiff asserts that, at some point before 2011, the now president of Indium, Ross Bernston, (i) "mimicked [Plaintiff's] accent" when Plaintiff was protesting his exclusion from meetings about projects on which Plaintiff was the principal scientist; and (ii) told Plaintiff that "[y]ou Chinese do not buy gifts for people, even your wife." (Dkt. No. 86-1, at 665). These

remarks show a racially discriminatory state of mind but were made four years before Plaintiff's termination and by an individual who had no part in the decision to terminate Plaintiff. "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d at 115. Thus, Bernston's actions and comments do not raise a material issue of fact about whether Plaintiff's termination was motivated by discriminatory animus.

### iii. Evans

Plaintiff testified that, at their January 24, 2014 meeting, he told Evans that he had wanted to report the abusive discrimination that two white managers had subjected him to, but that Lee had stopped him from doing so and told him he would "get worse results" if he reported this to Evans. (Dkt. No. 86-1, at 638–39). According to Plaintiff, Evans responded: "[H]ey, you see, Dr. Lee predicted this even in 2009." (Dkt. No. 86-1, at 639). Evans reportedly added that "perception is reality" concerning the possibility that Plaintiff's complaints could be interpreted as making him difficult to work with.  (Dkt. No. 86-1, at 23).

### iv. Lee

According to his affidavit, "at various times" Plaintiff complained to Lee that Chinese employees were being treated differently, and Lee responded that "[s]ome Chinese had been let go," which Plaintiff perceived as a "clear threat to terminate" his employment if he "persisted" in his claim of differential treatment. (Dkt. No. 86-1, ¶ 74). Although there is no evidence regarding when Lee made this remark or any circumstances underlying his comment, Lee was the sole individual responsible for deciding to terminate Plaintiff's employment; it bears directly on the termination of employment, and a reasonable jury could infer racial or retaliatory animus from the remark. Thus, it suffices to raise an inference of racial discrimination.

### d.     Prohibition Against Speaking Chinese

Plaintiff asserts that "Chinese employees were not allowed to speak Chinese at work at the pain of losing their jobs." (Dkt. No. 86, at 16). Lee testified that a manufacturing employee complained that a research scientist, whom she sat diagonally from, was speaking Chinese on the phone and it was distracting; she also complained about the "food smell." (Dkt. No. 86-1, at 252, 801–02). At some point, the research scientist was moved to a different floor. (Dkt. No. 86-1, at 253). At best, this evidence suggests racial animus on the part of the complaining employee. There is no evidence concerning the timing of the complaint or the movement of the research scientist to another floor; nor is there any evidence that the research scientist was disciplined in connection with the complaint or told not to speak Chinese. (Dkt. No. 86-1, ¶¶ 49, 52). Thus, this incident provides no basis for concluding Plaintiff, as an Asian, was treated differently because of his race. *Cf.*, *Joseph v. N. Shore Univ. Hosp.*, 473 F. App'x 34, 37 (2d Cir. 2012) (summary order) ("Joseph adduced no evidence to support her claim that other employees were permitted to speak Spanish in the workplace without being disciplined and thus no evidence that she was treated differently by the Hospital because of her Haitian origin.").

### e.     Replacement by Member of Protected Class

Indium hired "a Chinese/Asian scientist" to replace Plaintiff in R&D after Plaintiff was terminated. (Dkt. No. 84-10, ¶ 19). "Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of 'proof of intentional discrimination appears extremely difficult, if not practically impossible.'" *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 261 (E.D.N.Y. 2009) (quoting *Estepa v. Shad*, 652 F. Supp. 567, 571 n.5 (E.D.N.Y.1987)), *aff'd*, 371 F. App'x 115, 117–18 (2d Cir. 2010); *see also Umansky v. Masterpiece Int'l Ltd.*, No. 96-cv-2367, 1998 WL 433779, at *3, 1998 U.S. Dist. LEXIS 11775,

at *8 (S.D.N.Y. July 30, 1998) ("[T]he fact that plaintiff was replaced by another white female weighs heavily against an inference that she was discriminated against as a white female.").

Though many of Plaintiff's factual assertions fail to provide a basis for inferring racial discrimination and Indium's hiring of an Asian scientist to replace him weighs against such an inference, viewing the facts in the light most favorable to Plaintiff,  the Court concludes that Defendants' alleged disparate treatment of Plaintiff's complaint of harassment, which was connected to the series of events that led to his termination, and Lee's remark that "[s]ome Chinese had been let go"[28] are sufficient to satisfy Plaintiff minimal burden of showing that his termination occurred under circumstances giving rise to an inference of racial discrimination.

## 2.    Legitimate Nondiscriminatory Reasons

As Plaintiff has established a prima facie case of discrimination, a presumption of discrimination arises, and the burden shifts to Defendants to demonstrate some legitimate, nondiscriminatory reason for the adverse actions. *McDonnell Douglas Corp.*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendants have satisfied their burden here with evidence that Lee's decision to terminate him was based on the legitimate, nondiscriminatory reasons that Plaintiff was difficult to work with, had "numerous interpersonal difficulties, and had refused Lee's direct order to switch cubicles. (Dkt. No. 84-16, at 10); *see Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (finding that the plaintiff's alleged "profound

---

[28]The Second Circuit has noted that while "there may be fundamental conceptual differences between race and national origin discrimination '[p]rejudice is as irrational as is the selection of groups against whom it is directed … we cannot simply assume that employment discrimination invariably fits into neat, clearly distinct legal categories.'" *Deravin v. Kerik*, 335 F.3d 195, 202 n.5 (2d Cir. 2003) (quoting *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979) and citing *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 475 (1st Cir. 1993) (explaining that while race and national origin discrimination are not identical, "national origin discrimination could be used [by a jury], together with other evidence, to arrive at a conclusion vis-a-vis race discrimination")). Thus, construing the facts in the light most favorable to Plaintiff, while the remark that "[s]ome Chinese had been let go" references national origin, it may also support an inference of race discrimination. While Plaintiff argues that Defendants retaliated against him for complaining about race and national origin discrimination, he does not include national origin in his employment discrimination claim in his memorandum of law, (Dkt. No. 86).

inability to get along with her co-workers" represented "a legitimate, nondiscriminatory reason for an employment decision"). Therefore, the burden shifts back to Plaintiff to establish that this reason was a pretext for discrimination. *Weinstock*, 224 F.3d at 42.

### 3. Pretext

A plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part," on his race. *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). "[A] plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847. Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id*. at 846. Further, "[w]hile departures from regular procedures 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision,' summary judgment is appropriate where 'whatever irregularities existed' were either unrelated to discrimination or 'did not affect the final [adverse] decision.'" *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (quoting *Weinstock*, 224 F.3d at 41, 45).

In their brief, Defendants assert that Lee's reasons for terminating Plaintiff were that Plaintiff was difficult to work with, had "numerous interpersonal difficulties," and had refused Lee's direct order to switch cubicles. (Dkt. No. 84-16, at 10). Plaintiff argues that Lee's explanations for termination shifted and were false. Regarding Plaintiff's termination, Lee told Evans that "the disruptive factor" and Plaintiff's insubordination in connection with the cubicle switch were the reasons he was terminating Plaintiff's employment. (Dkt. No. 86-1, at 262, 445). Roller also recalled that Lee mentioned the problems created in the department by Plaintiff's failure to move his cubicle, and that Lee said he "would not tolerate such insubordination." (Dkt. No. 86-1, at 396, 398). Lee did not provide any reasons to Plaintiff when he terminated his employment. (Dkt. No. 86-1, at 185). In his deposition, Lee described Plaintiff's failure to move cubicles as "the last straw," noting that Plaintiff made "a very loud open remark . . . in front of the whole crowd" that he did not want to switch cubicles. (*Id*. at 185, 265). Lee considered Plaintiff's refusal to move was "a series of events about he has difficulty to fit into this big team." (*Id*. at 175).

Plaintiff contends that Defendants' assertion that he had conflict with employees other than Zhang is false. (Dkt. No. 86, at 7). Indeed, although Lee testified that Plaintiff had difficulty "getting along with other staff," namely research scientists Yan Liu, Dasgupta, and Kresge, he could recall few details. (Dkt. No. 86-1, at 186–88). Lee recalled that Plaintiff had a conflict with Yan Liu "three or four years" earlier and that Plaintiff had complained about Kresge's accidental chemical spill in a work area "five or six years" earlier but was unable to recall anything about Plaintiff's conflict with Dasgupta. (Dkt. No. 86-1, at 188–89). While this is some evidence of a possibly false reason for Plaintiff's termination, given Plaintiff's acknowledged failure to get along with Zhang and his refusal to switch cubicles, it is not

sufficient "to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the" termination. *Weinstock*, 224 F.3d at 42 .[29]

Nor has Plaintiff raised a triable issue of fact from which a jury could find that "the decision to fire him was based, at least in part," on his race. *Holcomb*, 521 F.3d at 141. Under Title VII, "a plaintiff may succeed simply by establishing that [race] was a 'motivating factor for any employment practice, even though other factors also motivated the practice.'" *Naumovski v. Norris*, No. 18-1556-cv, No. 18-2663-cv, 2019 WL 37701913, at *6, 2019 U.S. App. LEXIS 23891, at *13 (2d Cir. Aug. 12, 2019) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). The only evidence Plaintiff presents is the disparate treatment of the white technicians' complaints of harassment and Lee's undated comment that "[s]ome Chinese have been let go," in response to Plaintiff's complaint about Asians being treated differently. While this was sufficient to meet Plaintiff's minimal burden at the prima facie stage, it does not provide an adequate basis from which a reasonable factfinder could conclude that his race motivated Lee's decision to terminate Plaintiff's employment. Even assuming Defendants handled Plaintiff's complaints regarding Zhang's harassment differently than the white technicians' complaints of harassment, there is no evidence from which a jury could conclude the reason for the different treatment was race discrimination. Plaintiff has not shown that the white technicians

---

[29] Defendants rely on "the same actor inference" for the proposition that, because Lee hired and fired Plaintiff, "it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." (Dkt. No. 84-16, at 10 (quoting *Orellana v. Reiss Wholesale Hardware Co.*, No. 14-cv-1913, 2016 WL 4480720, at *7, 2016 U.S. Dist. LEXIS 76073, at *21 (E.D.N.Y. June 8, 2016), *report and recommendation adopted*, 2016 WL 4480962, 2016 U.S. Dist. LEXIS 112435 (E.D.N.Y. Aug. 23, 2016))). In this case, Plaintiff was hired in 2005 and his employment was terminated in 2016. In 2008, Lee persuaded Plaintiff to stay after learning Plaintiff had received an offer of employment from another company. Given the number of years between his hiring and firing, the Court finds the inference, if any, only minimally favorable to Defendants. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a *short time* after the hiring.").

had ongoing issues with another employee over a period of years or had refused a direction by their supervisor. And with respect to Lee's remark, Plaintiff provides no evidence regarding when Lee made the remark or showing that it was related to Lee's decision-making process. Moreover, the remark bears more directly on retaliatory animus; the remark alone is insufficient to show racial discrimination. *See Naumovski*, 2019 WL 37701913, at *8, 2019 U.S. App. LEXIS 23891, at *18 ("As we have observed, 'stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination.'" (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998))); c*f. Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("'Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.'" (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992))). Thus, Plaintiff has failed to raise a material issue of fact from which a factfinder could conclude that Lee's decision to fire him was in any way motivated by his race.[30]

## B. Retaliation

Plaintiff alleges that Defendants retaliated against him for "rais[ing] the issue of race discrimination during the course of his complaints to defendants" by terminating his employment. (Dkt. No. 32, ¶ 84). Plaintiff brings his retaliation claim under § 1981 and Title VII. (Dkt. No. 32, at 19–20, 23). "Retaliation claims under Title VII and § 1981 are both

---

[30] For these reasons, even assuming the more-demanding but-for standard applied to § 1981 employment discrimination claims, Defendants would be entitled to summary judgment. *See Naumovski*, 2019 WL 3770193, at *6 n.36, 2019 U.S. App. LEXIS 23891, at *14 n.36 (noting that "the Supreme Court recently granted a petition for a writ certiorari in *National Association of African American-Owned Media v. Comcast Corp.*, 743 F. App'x 106 (9th Cir. 2018), cert. granted in part, 2019 WL 1116317 (U.S. June 10, 2019) (No. 18-1171), on the following question: 'Does a claim of race discrimination under 42 U.S.C. § 1981 fail in the absence of but-for causation?'").

analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." *Littlejohn*, 795 F.3d at 315. Plaintiff must first establish a prima facie case of retaliation. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Id*. at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Nassar*, 570 U.S. at 362 (2013).

### 1.     Prima Facie Case

The four prongs of a prima facie case of retaliation are that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125. Defendants argue they are entitled to summary judgment dismissing Plaintiff's retaliation claim because "there is no allegation that Plaintiff's complaints about his disputes with Hong Wen Zhang had any racial or national origin composition" and that his complaints therefore "simply were not protected activities" under Title VII or § 1981. (Dkt. No. 84-16, at 12). Plaintiff responds that he "complained on several occasions that he and others were being mistreated on the basis of their Chinese ethnicity."[31] (Dkt. No. 86, at 20).

Defendants have disputed only the first prong; they assert, correctly, that Plaintiff's complaints about Zhang's harassment are not protected activities under Title VII or § 1981

---

[31] Section 1981 prohibits discrimination based on race" it does not "prohibit discrimination on the basis of . . . national origin." *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998). Thus, to the extent Plaintiff claims Defendants retaliated against him for complaining of discrimination based on race and national origin, his national origin claims fall under Title VII.

because they do not involve complaints regarding mistreatment based on race, (Dkt. No. 84-16,

at 12). *See, e.g.*, *Benn v. City of New York*, 482 F. App'x 637, 639 (2d Cir. 2012) (summary

order) (finding that the plaintiff failed to show he engaged in protected activity because "his

complaints to his supervisors concerned disputes about the teaching curriculum and his

responsibilities, the condescending manner in which one supervisor spoke to him, and a late-

night phone call from a supervisor that disturbed his sleep," explaining that "[s]uch complaints

could not reasonably have been understood to protest statutorily prohibited [race or national

origin] discrimination"). That does not end the analysis, however, because Plaintiff has cited

record evidence indicating that he engaged in protected activity: on January 2, 2014, he

complained to Lee that Lee and Roller had discriminated against him in the handling of his

complaints about Zhang, "in comparison to how the complaints of white females were handled,"

(Dkt. No. 86-1, ¶ 77); and on February 3, 2016, three months before Lee terminated him,

Plaintiff told Lee, when objecting to the cubicle switch that would  move Plaintiff closer to

Zhang, "that the company only treated Chinese/Asians in this dictatorial manner." (*Id.* ¶ 84; Dkt.

No. 86-1, at 626–27). "The term protected activity refers to action taken to protest or oppose

statutorily prohibited discrimination." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d

Cir. 2012). Thus, Plaintiff has adduced evidence from which a reasonable factfinder could

conclude that he engaged in protected activity under both Title VII and § 1981 when he

complained Lee was treating him differently based on his national origin and race. *See Cruz v.

Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a

Title VII violation need not rise to the level of a formal complaint in order to receive statutory

protection, this notion of 'opposition' includes activities such as 'making complaints to

management, writing critical letters to customers, protesting against discrimination by industry

or by society in general, and expressing support of co-workers who have filed formal charges.'"

(quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))).

In addition, Plaintiff has presented evidence satisfying the remaining prongs.[32] There is

evidence that Lee, the decision-maker, was aware that Plaintiff had complained that Lee treated

"Chinese/Asians" differently, (Dkt. No. 86-1, at 606 (Plaintiff testifying that in August 2013 he

told Lee that "he treat us differently than he treat the white Americans"); (Dkt. No. 86-1, ¶ 85

(Plaintiff stating in his affidavit that on February 3, 2016, he objected to Lee concerning the

cubicle switch, and that he "told Lee that the company only treated Chinese/Asians in this

dictatorial manner")).[33]

There is also evidence that Plaintiff suffered an adverse action: Lee terminated his

employment. (Dkt. No. 86-1, ¶ 92). *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)

("Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade

a reasonable worker from making or supporting a charge of discrimination.'" (quoting

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006))).

Finally, there is evidence a causal connection, which "can be shown either '(1) indirectly,

by showing that the protected activity was followed closely by discriminatory treatment, or

through other circumstantial evidence such as disparate treatment of fellow employees who

engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed

against the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. New York

City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Here there is evidence of temporal

---

[32] In their briefs, the parties discuss only whether Plaintiff engaged in protected activity, (Dkt. Nos. 84-16, 86, 87). Although Defendants' motion could be denied on this basis, the Court proceeds with the inquiry to ensure there is a question of fact on this claim. In addition, the parties discussed the remaining portions of the inquiry at oral argument.

[33] In his deposition, Plaintiff testified that he complained that Lee only made "this kind of request to Chinese, as Chinese to follow this unreasonable request." (Dkt. No. 86-1, at 627).

proximity: there were only three months between Plaintiff's February 3, 2016 complaint to Lee regarding Indium's treatment of "Chinese/Asians" and his May 9, 2016 termination. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). There is also evidence of retaliatory animus directed at Plaintiff by Lee. Plaintiff asserts that when he complained to Lee in January 2014 that Lee and Roller were discriminating against him by handling his complaints regarding Zhang's harassment differently than the complaints by "white females," Lee responded that Plaintiff was "a grownup" and "need[ed] to consider [his] future." (Dkt. No. 86-1, ¶ 77; Dkt. No. 86-1, at 633). Accordingly, the burden shifts to Defendants to show legitimate, nonretaliatory reasons for terminating Plaintiff's employment.

### 2. Legitimate Nonretaliatory Reasons

As stated above, Defendants have articulated legitimate, nondiscriminatory reasons for the decision to terminate Plaintiff's employment, which are also nonretaliatory in nature. *See supra* Section IV.A.2.

### 3. Pretext

Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for the adverse action, that reason overcomes the presumption of retaliation created by the plaintiff's prima facie case. *Kwan*, 737 F.3d at 845. The defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *id.*, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer," *Nassar*, 570 U.S. at 362; *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 246–47 (E.D.N.Y. 2014) (applying but-for standard to the

plaintiff's retaliation claim under Title VII). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 845-46. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

As discussed *supra* Section IV.A.3, Defendants have argued in their motion papers that Plaintiff's "numerous interpersonal difficulties" was one of the reasons for his termination. (Dkt. No. 84-16, at 10). Although Lee testified at his deposition regarding Plaintiff's alleged difficulty "getting along with other staff," he was unable to provide more than a few factual details concerning Plaintiff's purported conflicts with Yan Liu, Dasgupta, or Kresge. (*Id.*). Moreover, the details Lee did provide indicated that conflicts occurred several years prior to Plaintiff's termination. (*Id.*). A factfinder could infer from Lee's inability to describe these purported conflicts to be some evidence of pretext. Moreover, a reasonable factfinder considering this evidence in combination with: (i) Lee's comment that "[s]ome Chinese had been let go," in response to Plaintiff's complaint that Chinese employees were treated differently (Dkt. No. 86-1, ¶ 74); (ii) Lee's remark that Plaintiff "need[ed] to consider [his] future," in response to Plaintiff's January 2014 complaint that Lee and Roller had discriminated against him in handling his complaints about Zhang in comparison to how the complaints of white females were handled," (Dkt. No. 86-1, ¶ 77); (iii) Plaintiff's February 2016 complaint, after Lee refused to "consider [Plaintiff's] request not to switch [cubicles]" that "the company only treated Chinese/Asians in

this dictatorial manner, (Dkt. No. 86-1, ¶ 84); and (iv) his termination three months later, could conclude, viewing all the circumstances, that but for Plaintiff's complaints of discrimination, Lee would not have terminated Plaintiff's employment. *See, e.g.*, *Thomlison v. Sharp Elecs. Corp.*, No. 99-cv-9539, 2000 WL 1909774, at *4 2000 U.S. Dist. LEXIS 18979, at *12 (S.D.N.Y. Dec. 18, 2000) ("Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim."). While Lee testified consistently that Plaintiff's refusal to switch cubicles was only one, among many factors that led to Plaintiff's termination, because the switch goes to the heart of Plaintiff's complaints regarding Lee's refusal to take his complaint about Zhang's harassment seriously because he was "Chinese/Asian," it is for a factfinder to determine whether, but for[34] Plaintiff's complaints of race and national origin discrimination, Lee would have terminated Plaintiff's employment.

### C. Individual Section 1981 Claims against Evans and Roller[35]

"In order to make out a claim for individual liability under § 1981, 'a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'" *Patterson*, 375 F.3d at 229 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)). "'Personal involvement' is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in

---

[34] Given this conclusion, the Court need not determine whether Plaintiff's § 1981 retaliation claim is governed by the "but-for" or less-demanding "motivating-factor" standard articulated in *Garcia v. Hartford Police Department*, 706 F.3d 120 (2d Cir. 2013), which predated *Nassar*, in connection with a § 1981 and § 1983 retaliation claim.

[35] As Defendants are entitled to summary judgment dismissing Plaintiff's employment discrimination claim, there is no basis for personal liability against the individual defendants in connection with that claim. Accordingly, the Court only considers Evans and Roller's liability in connection with the § 1981 retaliation claim.

supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001)).

The totality of the evidence concerning Evans' conduct toward Plaintiff consists of (i) Evans' meeting with Plaintiff on January 24, 2014 about Zhang's harassment, when he allegedly stated that Lee was right to tell Plaintiff not to complain about discrimination he had experienced by white managers, (Dkt. No. 86-1, at 639), and did nothing about Zhang's purported harassment; and (ii) Evans' knowledge that Lee was moving Plaintiff's cubicle, that Plaintiff wanted to meet with him about it, and that Lee had decided to terminate Plaintiff based on the "disruptive factor" and "insubordination" in connection with the cubicle switch. (Dkt. No. 86-1, at 262, 445). Evans testified that, while he did not know the proposed switch would bring Plaintiff and Zhang closer together, "he should have" known this "considering they were in the same type of projects." (Dkt. No. 86-1, at 448). It is undisputed, however, that Lee had complete hiring and firing authority in R&D and there is no evidence that Evans was involved in the decision to terminate Plaintiff's employment. (Dkt. No. 86-1, at 518). Thus, there is no basis on which a reasonable factfinder could conclude that Evans was personally involved in the decision to terminate Plaintiff's employment. *See Dolson v. N.Y. State Thruway Auth.*, 80 F. App'x 694, 696 (2d Cir. 2003) (summary order) (affirming summary judgment dismissing personal involvement claim where the plaintiff presented "no evidence that any of the individual defendants personally participated in the decision to terminate his employment" and the "ultimate decision to terminate Dolson's employment was made by the TA's Executive Director," not the individual defendants).

As to Roller, while there is evidence that Roller was told of and present for Plaintiff's termination,[36] there is no evidence from which a factfinder could infer that she knew Plaintiff engaged in protected activity in February 2016, three months before his termination. Plaintiff avers that he told Roller in December 2013 that "the company did not take [his] complaint [about Zhang] seriously compared to how the complaints of white female technicians were handled" and that she responded that if Plaintiff "did not stop" he "would be fired." (Dkt. No. 86-1, ¶ 75). But when Plaintiff complained to Roller in early 2016 about the cubicle switch, he did not complain of race discrimination; he told Roller that he believed that Lee was "retaliating against [him] for [his] unwillingness to give in to Lee's unethical scientific demands, which was the real reason for the cubicle switch." (*Id.* ¶ 85). Although Roller may have known of Plaintiff's protected activity in 2013, in view of Plaintiff's complaint in 2016 that Lee was retaliating against him for his refusal to give in to unethical scientific demands, no reasonable factfinder could conclude that Roller had any awareness of Plaintiff's purported complaint to Lee that the cubicle switch was motivated by racial or national origin discrimination. In the absence of evidence that Roller knew that Plaintiff had engaged in protected activity in the months leading up to his termination, there is no basis for individual liability in connection with Plaintiff's § 1981 retaliation claim. *See Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 138 (2d Cir. 1999) (concluding that where the plaintiff did not establish that the municipal official knew about his protected activities, the official could not be held liable in his personal capacity). Accordingly, Evans and Roller are entitled to summary judgment on Plaintiff's § 1981 retaliation claims.

---

[36] In a note dated May 6, 2016, Roller advised Lee that "[t]he employment law attorney suggests we terminate [Plaintiff] utilizing a severance agreement" and "further suggested your and I meet in person with [Plaintiff] together to terminate employment." (Dkt. No. 86-1, at 775). Further, Roller was present with Lee when Plaintiff's employment was terminated. (*Id.* at 676; Dkt. No. 86-1, ¶ 92).

## V.      State Law Claims

### A.      Breach of Contract

Plaintiff claims that Defendants breached his employment contract by terminating his employment "for factors unrelated to Plaintiff's work ethic." (Dkt. No. 86, at 11). Defendants argue they are entitled to summary judgment because "there [was] no agreement as to fixed duration." (Dkt. No. 84-16, at 5). In New York, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333 (1987). "This presumption does not apply, however, when the employer and the employee are parties to an 'agreement establishing a fixed duration.'" *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 137 (2d Cir. 2007) (quoting *De Petris v. Union Settlement Ass'n*, 86 N.Y.2d 406, 410 (1995)).

In New York, "[a]n agreement can establish a fixed duration even if its duration cannot be determined ab initio." *Reddington*, 511 F.3d at 137 (citing *Rooney v. Tyson*, 91 N.Y.2d 685, 692 (1998) ("New York's jurisprudence is . . . not so rigid as to require that a definite duration can be found only in a determinable calendar date."). The duration, however, must be "delimited by legally and realistically cognizable boundaries." *Rooney*, 91 N.Y.2d at 691. In *Rooney*, on which Plaintiff heavily relies, the plaintiff argued that the promise that he would be employed as a fight trainer "for as long as the boxer fights professionally" was an agreement of fixed duration. *Rooney*, 91 N.Y.2d at 687. The New York Court of Appeals agreed, explaining that, "although the exact end-date of Tyson's professional boxing career was not precisely calculable, the boundaries of beginning and end of the employment period are sufficiently ascertainable." *Rooney*, 91 N.Y.2d at 692. It further explained that "[t]he range of the employment relationship . . . is established by the definable commencement and conclusion of Tyson's professional boxing career. Though the times are not precisely predictable and calculable to dates certain,

46

they are legally and experientially limited and ascertainable by objective benchmarks." *Rooney*, 91 N.Y.2d at 692.

This case is distinguishable from *Rooney* because it does not contain a cognizable outer boundary: Lee promised only that "as long as Lee was with Indium, [Plaintiff's] job was secure." (Dkt. No. 86-1, ¶ 20–21). In other words, the purported promise cannot be read to contain a "definable . . . conclusion" to Plaintiff employment because it would not necessarily end in the event Lee left Indium; at best, it was a promise that Plaintiff's employment would continue until that point. Moreover, it depended on a certain level of performance: as long as Plaintiff "worked hard." (*Id.* at ¶ 20); *see Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 225 (E.D.N.Y. 2002) ("[P]laintiff in this case claims that he agreed to work until retirement, provided performance warranted such a term. Unlike in *Rooney*, this durational term is not 'legally and experientially limited and ascertainable by objective benchmarks.'").

In any event, Defendants have adduced evidence that in 2012 Plaintiff signed an acknowledgement regarding the contents of the Indium employee handbook, which expressly states that employment is at will:

> Employment-at-Will
>
> Policy Statement – Indium Corporation follows the practice of employment-at-will. The Company does not promise or guarantee employment for any specified period of time. Either an employee or the Company may end the employment relationship at any time, for any reason, with or without cause or notice.

(Dkt. No. 86-1, at 713). According to Defendants, "[e]mployees receive training on the employee manual and sign a receipt acknowledging that they have received the Employee Manual"; Plaintiff "received such training and acknowledged his Employee Manual on May 24, 2012." (Dkt. No. 84-10, ¶ 6). The "Indium Corporation Employee Handbook Acknowledgement," which is signed by Plaintiff, states that he acknowledges that he has "read or will read the

contents of the employee handbook" and that he agreed "to abide by the policies contained herein." (Dkt. No. 84-13, at 1). It further states, just above Plaintiff's signature: "Employment at Indium Corporation is employment-at-will. Accordingly, this handbook is not intended to be a contract of employment, a warranty of benefits, or a limitation on the Company's ability to terminate employees." (Dkt. No. 84-13, at 1). Disclaimers in employee manuals "prevent[ ] the creation of a contract and negate[ ] any protection from termination [that] plaintiff may have inferred." *Lobosco v. N.Y. Tel. Co./NYNEX*, 96 N.Y.2d 312, 317 (2001). Thus, Indium has made clear through its employee manual and the acknowledgement, which Plaintiff signed in 2012, that employment was at will and that Indium could "end the employment relationship at any time, for any reason, with or without cause or notice." (Dkt. No. 86-1, at 713). Thus, the disclaimer—"this handbook is not intended to be a contract of employment," together with the express statement, which Plaintiff signed in 2012, acknowledging that employment was at will— negates any protection from termination Plaintiff may have inferred from his 2008 negotiations with Lee. *See, e.g.*, *Lobosco*, 96 N.Y.2d at 317 (concluding that the disclaimer at issue—which stated that the "code of conduct is not a contract of employment and does not create any contractual rights," and further that employment was "at-will" and could not be modified "except in a written agreement"—"prevents the creation of a contract and negates any protection from termination plaintiff may have inferred from the manual's no-reprisal provision"). Thus, in the absence of evidence from which a reasonable factfinder could infer the presence of an employment contract, Plaintiff's breach-of-contract claim fails and must be dismissed.

### B. Implied Contract – Employee Handbook

Plaintiff contends that: (i) the Indium Employee Handbook created an implied contract guaranteeing that he would not experience retaliation if he reported misconduct; (ii) he relied on that promise in complaining about Lee's falsifying data concerning an alloy and Zhang's

harassment; and (iii) Defendants breached that contract by terminating him in retaliation for reporting misconduct. (Dkt. No. 86, at 26).

As discussed above, (*see supra* Section V.A.), in New York, employment is presumed to be at will. *Sabetay*, 69 N.Y.2d at 333. The presumption of employment at will "can be rebutted . . . by establishing an 'express limitation in the individual contract of employment' curtailing an employer's right to terminate at will." *Baron v. Port Auth.*, 271 F.3d 81, 85 (2d Cir. 2001) (quoting *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 851 (2d Cir. 1985)).

> Policies in a personnel manual specifying the employer's practices with respect to the employment relationship, including the procedures or grounds for termination, may become a part of the employment contract. *See, e.g.*, *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 87–89 (2d Cir. 1998) (holding that policies set out in employee handbook formed implied contractual obligations); *Gorrill*, 761 F.2d at 851–53 (same; notably no express disclaimer in company's operations manual). To establish that such policies are a part of the employment contract, an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment.

*Baron*, 271 F.3d at 85 (citing *Lobosco*, 96 N.Y.2d at 316 (2001)).

As Plaintiff notes, the Employee Handbook allows an employee to report harassing behavior "to their supervisor or the HR Manager" and indicates that "[a]ll complaints received are investigated promptly, thoroughly, and in as impartial a manner as possible." (Dkt. No. 86-1, at 724). It further states that "Indium Corporation will not retaliate, intimidate, coerce, threaten, discriminate, or otherwise take any adverse employment action against an employee who files a complaint . . . or opposes discriminatory practices." (*Id.* at 725). It is this latter provision that Plaintiff relies on, arguing that it prohibits Defendants from terminating his employment in retaliation for complaining about harassment or discrimination. (Dkt. No. 86, at 26).

While "[p]olicies in a personnel manual specifying the employer's practices with respect to the employment relationship, including the procedures or grounds for termination, may become a part of the employment contract," "'conspicuous disclaiming language' in an employee handbook 'preserves [the employer's] . . . at will employment relationship with' its employees as far as the provisions in an employee handbook are concerned." *Baron*, 271 F.3d at 85, 87 (quoting *Lobosco*, 96 N.Y.2d at 316–17). Here, the Employee Handbook contains the following "[d]isclaimer": "The policies, procedures, and rules set forth in this employee handbook are general guidelines only and are not meant to be all-inclusive. The employee handbook should therefore not be interpreted as forming an express or implied contract of employment." (Dkt. No. 86-1, at 709). It further states: "The employee handbook should not be interpreted as a guarantee that the policies discussed in it will be applied in all cases. At its sole discretion, the Company may make exception to its policies from time to time." (*Id.* at 710). In addition, as discussed above, the Employee Handbook expressly provides that employment is at will. (Dkt. No. 84-13, at 1). Indeed, the employee acknowledgement form states: "Employment at Indium Corporation is employment-at-will. Accordingly, this handbook is not intended to be a contract of employment, a warranty of benefits, or a limitation on the Company's ability to terminate employees." (*Id.*). Thus, the Employee Handbook did not create an implied contract. *See Baron*, 271 F.3d at 85–86 ("[T]he plaintiffs' implied contract claims fail because none of the writings identified by the parties—the Port Authority Guide (Baron) or the PAIs (all the plaintiffs)—constitutes a written express limitation on the Port Authority's right to hire, fire, promote, demote, transfer or take any other employment action it deems otherwise appropriate. To the contrary, the disclaimers at the front of both the Port Authority Guidebook and the PAIs expressly and specifically disavow any intent on the Port Authority's part to accept contractual

limitations on its rights as an at-will employer."). Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's breach-of-implied-contract claim.

### C. Defamation

Defendants seek summary judgment dismissing Plaintiff's defamation claim on the ground that Plaintiff has not identified "the actual defamatory words . . . with particularity" and that "in this case, there is simply a difference of opinion as to how test results should be interpreted." (Dkt. No. 84-16, at 16). Additionally, Defendants argue that, even if Lee is liable for defamation, Indium cannot be, and that most of Plaintiff's claims are barred by the one-year statute of limitations. (*Id.* at 18).

Plaintiff alleges in the Amended Complaint that Defendants "falsely attributed to plaintiff authorship of an article he did not author which contained false statement." (Dkt. No. 32, ¶ 102). According to Plaintiff, it "falsely referenced alloy #6 in Table 1 as if it were a product of Indium Corporation whereas it was a product by a Japanese competitor." (*Id.* ¶ 103). The article at issue "was published at a September 27, 2015 – October 1, 2015 SMTA convention . . . of scientists and engineers in plaintiff's field." (*Id.* ¶ 104). Plaintiff asserts he was "ridiculed, disgraced, and discredited" as a result. (*Id.* ¶ 105).

In New York, "[d]efamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)). To establish a defamation claim, a Plaintiff must show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).

In this case, the allegedly false statements are that Plaintiff is the lead author on the paper entitled "Novel Lead-Free Alloys Development for Automotive Applications," (Dkt. No. 86-1, at 1018), and that a Japanese competitor's alloy is listed in the paper as one of Indium's alloys. (Dkt. No. 86, at 22). In this case, however, Plaintiff never asked not to be listed as an author on the paper; he asked not to be listed first. (Dkt. No. 86-1, ¶ 100; Dkt. No. 86-1, at 297). Below the title, is the following line: "Dr. Weiping Liu and Dr. Ning-Cheng Lee, Indium Corporation." (Dkt. No. 86-1, at 1018). In addition, no reasonable factfinder could conclude that the alloy ("Alloy #6" – "SAC+SbNi") was listed as an Indium alloy; it is listed as a "Solder alloy[] tested in this study." (*Id.*). Although Plaintiff asserts that the paper failed to describe "Alloy #6's" origin accurately, the paper does not identify the origins of any of the eight alloys tested. Thus, there is nothing in the paper that suggests Alloy #6 was listed as an Indium alloy. In the absence of a false statement, and Plaintiff having identified no basis for harm from the use of his name on the paper other than the alleged misattribution of Alloy #6, his defamation claim fails. Accordingly, Lee and Indium are entitled to summary judgment dismissing the defamation claim.[37]

### D. Intentional Infliction of Emotional Distress

Defendants seek summary judgment dismissing Plaintiff's claim of intentional infliction of emotional distress because he fails to adduce evidence of sufficiently outrageous conduct. (Dkt. No. 84-16, at 19). "Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal

---

[37] Defendants' argument that Plaintiff's defamation claim is barred by the one-year statute of limitations applicable to such claims, *see* N.Y. C.P.L.R. § 215 (actions to recover damages for libel or slander "shall be commenced within one year"), is without merit. Plaintiff filed this action on September 2, 2016, (Dkt. No. 1); the paper at issue was published at a conference held between September 27 and October 1, 2017. (Dkt. No. 86-1, ¶¶ 99–100).

connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Id.* (quoting *Howell*, 81 N.Y.2d at 122).

"The determination whether the requisite outrageousness has been established is, in the first instance, an issue of law for the courts," *Cavallaro v. Pozzi*, 28 A.D.3d 1075, 1078 (4th Dep't 2006) (citing *164 Mulberry St. Corp. v. Columbia Univ.*, 4 A.D.3d 49, 56 (1st Dep't 2004)), and "it is well settled that a cause of action for intentional infliction of emotional distress is viable where 'severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation.'" *Id.* (quoting *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569 (1970)).

In support of this claim, Plaintiff relies on evidence that the "cubicle switch would have caused [him] extreme emotional distress, in light of the well-established conflict between him and Zhang." (Dkt. No. 86, at 25). Plaintiff further argues that Lee "wished to subjugate [Plaintiff] to himself and cause [Plaintiff] to lose face in front of all his colleagues." (*Id.*). Even assuming the cubicle switch was the culmination of a harassment campaign, initiated by Zhang and condoned and eventually stoked by Lee—in proposing to move Plaintiff's workspace close to Zhang's—such evidence falls short of "the level of outrageousness or the kind of "deliberate and malicious campaign of harassment or intimidation" necessary to sustain a claim of intentional infliction of emotional distress. *Seltzer v. Bayer*, 272 A.D.2d 263, 265 (1st Dep't 2000) (concluding that the plaintiff's claims "that defendant dumped a pile of cement on the sidewalk

in front of his house, tossed lighted cigarettes into his backyard, threw eggs on his front steps, and threatened once to paint a swastika on his house," while "[n]oxious and deplorable" did "not rise to the level of outrageousness or the kind of 'deliberate and malicious campaign of harassment or intimidation' that can survive a motion for summary judgment under controlling" New York law). Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's intentional infliction of emotional distress claim.

E.     **New York Civil Rights Law § 51**

Defendants move for summary judgment dismissing Plaintiff's claim of unauthorized use of his name "for advertising purposes and for purposes of trade," in violation of New York Civil Rights Law § 51, in connection with the use of his name on the "Novel Lead-Free Solder Alloys Development for Automotive Applications" paper published at the conference held from September 27 to October 1, 2017.[38] (Dkt. No. 86-1, ¶¶ 99–100). Specifically, Defendants argue, "[a]rticles published in trade journals that are informative or newsworthy . . . cannot form the basis for a cause of action under Civil Rights Law § 51," and Plaintiff in any event "signed an invention assignment agreement" with Indium and "never asked Dr. Lee to remove [his] name" from the paper. (Dkt. No. 84-16, at 20–21).

Section 51 of the New York Civil Rights Law provides in relevant part: "Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided . . . may . . . sue and recover damages for any injuries sustained by reason of such use." N.Y. Civ. Rights Law § 51. "Use for 'advertising purposes' and use 'for the purposes of trade' are separate and distinct

---

[38] Although Defendants argue the one-year statute of limitations bars claims prior to September 2, 2016, (Dkt. No. 84-16, at 21 (citing N.Y. C.P.L.R. § 215(3))), Plaintiff's claim arises from publication of this paper, (Dkt. No. 86, at 23), and is, therefore, timely.

statutory concepts and violations." *Beverley v. Choices Women's Med. Ctr., Inc.*, 78 N.Y.2d 745, 751 (1991). Courts have defined use "for the purposes of trade" as use which "would draw trade to the firm" or "use for the purpose of making profit." *Zoll v. Jordache Enters. Inc.*, 01-cv-1339, 2003 WL 1964054, at *16, 2003 U.S. Dist. LEXIS 6991, at *51–52 (S.D.N.Y. Apr. 24, 2003) (citing *Kane v. Orange Cty. Publ'ns*, 232 A.D.2d 526, 527 (2d Dep't 1996)).

Here, the paper on solder alloys was published at the Surface Mount Technology Association International ("SMTA") conference.[39] (Dkt. No. 86-1, ¶ 100). According to Plaintiff, Indium "used . . . papers to publicize itself for the purpose of attracting customers, since its customers were manufacturers seeking high quality materials for use in their products." (*Id.* ¶ 18). And the solder alloys paper was no different—the purpose "of writing the paper[] and trying to demonstrate the superiority of solder products with manganese . . . was to persuade companies interested in using Indium's product that its product was in essence 'new and improved' so they would buy it." (Dkt. No. 86-1, ¶ 107). Thus, there is evidence which, if credited, shows that Indium used the solder alloy paper to "draw trade to the firm." *Zoll*, 2003 WL 1964054, at *16, 2003 U.S. Dist. LEXIS 6991, at *51–52.

Plaintiff's proof, however, fails to show that the *use of his name* was "sufficiently related to a commercial end." *Id.* In *Zoll*, the court explained that in determining whether there was a violation of section 51, "[t]he court should focus on whether the use of plaintiff's image was 'sufficiently related to a commercial end' or 'mercantile rewards.'" *Zoll*, 2003 WL 1964054, at *16, 2003 U.S. Dist. LEXIS 6991, at *55 (quoting *Griffin v. Harris, Beach, Wilcox, Rubin & Levey*, 112 A.D.2d 514, 516 (3d Dep't 1985)); *see, e.g.*, *Radio Today, Inc. v. Westwood One,*

---

[39] The SMTA is an "industry group of electronics engineering and manufacturing professionals." (Dkt. No. 86-1, ¶ 108).

*Inc.*, 684 F. Supp. 68, 74–75 (S.D.N.Y. 1988) (denying motion to dismiss claim under section 51 where the plaintiffs alleged that the defendant "deliberately mislabeled the . . . albums for the purpose of misleading radio stations into accepting [the albums] and to exploit the plaintiffs' goodwill and reputation," explaining that "[t]he thrust of plaintiffs' allegations is that defendant misused [plaintiff] Dan Formento's name for the purpose of commercial exploitation, which . . . is the harm that the statute is meant to prevent"). In this case, there is no evidence from which a factfinder could conclude that the inclusion of Plaintiff's name on the paper was made with a view of inducing others to purchase Indium's solder products. Indeed, the only evidence on this score is that Lee used his employees' names, including, in this instance, Plaintiff's, with a view of increasing his visibility and improving their reputations "in the industry," (Dkt. No. 86-1, at 297). Given the attenuated relationship between the presence of Plaintiff's name on the paper and any hoped-for gains on the part of Indium, any trade or advertising rewards that might inure to Indium for the usage of Plaintiff's name were far too remote or speculative for a factfinder to conclude that such use "would draw trade to the firm" or was "for the purpose of making profit." *Zoll*, 2003 WL 1964054, at *16, 2003 U.S. Dist. LEXIS 6991, at *55; *see also Griffin*, 112 A.D.2d at 516 (affirming summary judgment dismissing the plaintiff's claim that the defendants used his name in a federal action "in an effort to defeat the plan to build a competing hotel, calculating that plaintiff's reputation as a representative of the poor would rally the community to oppose it," explaining that the use of the plaintiff's name was "not sufficiently related to a commercial end to constitute a use for the purposes of trade' as required by Civil Rights Law § 51" and that "[w]hile such use might have been inspired by the profit motive, that is not, by itself, a sufficient foundation for this cause of action"). Accordingly, Defendants' are entitled to summary judgment dismissing Plaintiff's New York Civil Rights Law § 51 claim.

## VI.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 84) is **DENIED**
as to Plaintiff's Title VII retaliation claim (Eighth Cause of Action) against Defendant Indium
and as to Plaintiff's § 1981 retaliation claim (Third Cause of Action) against Defendants Indium
and Lee; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 84) is otherwise
**GRANTED** in its entirety and all claims, except for Plaintiff's Title VII retaliation claim (Eighth
Cause of Action) against Defendant Indium and Plaintiff's § 1981 retaliation claim (Third Cause
of Action) against Defendants Indium and Lee, are **DISMISSED with prejudice**; and it is
further

**ORDERED** that the Clerk of the Court is directed to terminate Evans and Roller as
defendants.

**IT IS SO ORDERED.**

Dated:  August 15, 2019
          Syracuse, New York

Brenda K. Sannes
U.S. District Judge